# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:15-cr-00238-SI-2 |
| v. | **OPINION AND ORDER ON DEFENDANT YATES'S MOTION FOR ADDITIONAL DISCOVERY** |
| DAN HEINE and DIANA YATES, | |
| Defendants. | |

Billy J. Williams, United States Attorney, and Claire M. Fay, Michelle Holman Kerin, and Quinn P. Harrington, Assistant United States Attorneys, UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF OREGON, 1000 S.W. Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for the United States of America.

Janet Lee Hoffman, JANET HOFFMAN & ASSOCIATES, LLC, 1000 S.W. Broadway, Suite 1500, Portland OR 97205. Of Attorneys for Defendant Diana Yates.

**Michael H. Simon, District Judge.**

Defendant Diana Yates ("Yates") and her co-defendant Dan Heine ("Heine") are charged with conspiracy to commit bank fraud and making false bank entries, reports, and transactions during the time that they were affiliated with The Bank of Oswego (the "Bank"). Before the Court is Yates's Motion for Additional Discovery pursuant to Federal Rule of Criminal Procedure ("Rule") 16(a) and *Brady v. Maryland*, 373 U.S. 83 (1963). For the reasons that follow, Yates's Motion is granted in part and denied in part.

PAGE 1 – OPINION AND ORDER

**STANDARDS**

**A.  Rule 16(a)**

Rule 16(a) "grants criminal defendants a broad right to discovery." *United States v. Stever*, 603 F.3d 747, 752 (9th Cir. 2010). Rule 16(a)(1)(E) provides that a criminal defendant is entitled to discovery of documents and tangible things that are within the government's possession, custody, or control if the requested information is "material to preparing the defense." Documents and tangible things are in the government's possession if the prosecutor "has knowledge of and access to the documents sought by the defendant." *Stever*, 603 F.3d at 752 (quoting *United States v. Santiago*, 46 F.3d 885, 893 (9th Cir. 1995)). The requested information need not be admissible in evidence in order to be discoverable. *See* Robert M. Cary, Craig D. Singer & Simon A. Latcovich, *Federal Criminal Discovery* 96 (ABA Criminal Justice Section 2011) (hereinafter *Federal Criminal Discovery*).

A defendant's right of discovery under Rule 16, although broad, is not unlimited. Rule 16(a)(2) excludes some information from disclosure, including "reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." The purpose of the work product exception is to "protect from disclosure the opinions and mental impressions of government counsel and government agents in conducting their investigation and prosecution of the case." *Federal Criminal Discovery* 131; *see also United States v. Fernandez*, 231 F.3d 1240, 1247 (9th Cir. 2000) (describing Rule 16(a)(2) as a recognition of "the work product privilege" in criminal cases).

Additionally, a defendant must make a prima facie showing of materiality before obtaining discovery under Rule 16(a)(1)(E). *Stever*, 603 F.3d at 752. "Neither a general description of the information sought nor conclusory allegations of materiality suffice; a

defendant must present facts which would tend to show that the Government is in possession of information helpful to the defense." *United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990) (discussing former Rule 16(a)(1)(C)); *see also United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993) (stating that Rule 16's materiality requirement "normally 'is not a heavy burden,' . . . rather, evidence is material as long as there is a strong indication that it will 'play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal'") (quoting *United States v. George*, 786 F. Supp. 56, 58 (D.D.C. 1992)). Rule 16 is broader than *Brady* because "[i]nformation that is not exculpatory or impeaching may still be relevant to developing a possible defense." *United States v. Muniz-Jaquez*, 718 F.3d 1180, 1183 (9th Cir. 2013).

In *United States v. Muniz-Jaquez*, the Ninth Circuit held that a defendant satisfied Rule 16's materiality requirement when he argued for the production of U.S. Border Patrol dispatch tapes mid-trial. *Id.* at 1183-84. A U.S. Border Patrol agent testified that immediately after seeing the defendant and other individuals near the border, he called for backup over his service radio. *Id.* at 1182. The prosecutor learned during recess that the agent's call for backup would have been recorded on dispatch tapes. *Id.* The defendant argued that the tapes are discoverable under Rule 16 and *Brady* because they are relevant to establishing whether law enforcement observed the defendant from the moment of his entry until arrest, and thus whether he could present an official restraint defense. *Id.* The defendant also argued that the tapes could impeach the agent. *Id.* at 1183. The district court characterized the defendant's arguments as speculative and untimely, and refused to order production of the dispatch tapes. *Id.*

The Ninth Circuit disagreed and found that the defendant satisfied Rule 16's materiality requirement, reasoning as follows:

> Defense counsel here made clear that he sought the tapes to potentially further an official restraint defense, as well as for possible use in impeaching the agent. This was not a fishing expedition. . . . [T]he tapes could have been crucial to Muniz-Jaquez's ability to assess the reliability of Agent Woodford's testimony and to cross-examine him effectively, both important issues in his defense. Moreover, given Agent Woodford's testimony that he immediately called for backup, the tapes were clearly relevant to the defendant's location and the official restraint defense.

*Id.* at 1184. Thus, the Ninth Circuit concluded that "[t]he district court had no basis for finding the defendant's showing of materiality to be speculative." *Id.*

Similarly, in *United States v. Doe*, 705 F.3d 1134 (9th Cir. 2013), the Ninth Circuit found that the district court abused its discretion in denying Rule 16 discovery requests for "any records or reports containing information Doe [the defendant] relayed to the FBI regarding illegal activity and any FBI calendars or other documents showing planned meetings with Doe." *Id.* at 1150-51. The Ninth Circuit reasoned that the documents would have been "helpful to his defense," including his entrapment defense and his public authority defense. *Id.* The Ninth Circuit explained:

> The documents, if they existed, could have been used by Doe to help establish his state of mind. They could have been used by the jury in their determination of whether the public authority defense was established, or whether Doe's belief that he was working with the FBI was reasonable. They most certainly could have been used to impeach the FBI agent at trial. And, at the very least, they could have helped to establish Doe's credibility. The list of potential uses of these documents goes on and on. For the district court to say that it could not determine whether the requests fell under Rule 16(a)(1)(E)(i) is to say that it is unclear if the documents were "material to preparing the defense." This conclusion, however, is not correct, especially considering that "[e]vidence is relevant if it has *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

*Id.* at 1151 (emphasis in original) (quoting *Stever*, 603 F.3d at 753).

PAGE 4 – OPINION AND ORDER

In contrast, in *United States v. Santiago*, the Ninth Circuit held that a defendant failed to make a "threshold showing of materiality" of government witnesses' prison files under Rule 16. 46 F.3d at 894. The defendant argued that evidence from the prison files regarding the witnesses' gang affiliations is material because whether any witness is linked to a rival gang could be information relevant to impeachment at trial. *Id.* The Ninth Circuit explained that although the defendant had access to other documents regarding the government witnesses, and had interviewed several prison inmates, the defendant "did not cite any fact, such as a statement by the defendant or one of the interviewed witnesses, that might link one of the witnesses to a rival gang." *Id.* at 895. Accordingly, the Ninth Circuit concluded that the defendant "only asserted 'conclusory allegations' without grounding in fact," and that the defendant did not satisfy Rule 16's materiality requirement. *Id.* (quoting *Mandel*, 914 F.2d at 1219).

## B. *Brady* Material

"There is no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). Under *Brady*, however, "prosecutors are constitutionally obligated to disclose 'evidence favorable to an accused . . . [that] is material either to guilt or to punishment.'" *Amado v. Gonzalez*, 758 F.3d 1119, 1133 (9th Cir. 2014) (alterations in original) (quoting *Brady*, 373 U.S. at 87). The Supreme Court instructs that under *Brady*, "evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)); *see also United States v. Gamez-Orduno*, 235 F.3d 453, 461 (9th Cir. 2000) ("The suppression of material evidence helpful to the accused, whether at trial or on a motion to suppress, violates due process if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.") (citing *Brady*, 373 U.S. at 87; *United States v. Barton*, 995 F.2d 931, 933-

34 (9th Cir. 1993)). Whether the government has complied with its *Brady* obligation to disclose material information is generally a determination that is made in post-trial proceedings. *United States v. McVeigh*, 954 F. Supp. 1441, 1449-50 (D. Colo. 1997) ("Generally, *Brady* violations first come before a court after the trial and the court may then consider the materiality of what was suppressed or omitted from disclosures made, in the context of the complete trial record.").

The government has a "broad obligation" to disclose information under *Brady*. *Amado*, 758 F.3d at 1134 (quoting *Strickler*, 527 U.S. at 281). "The government, where doubt exists as to the usefulness of evidence, should resolve such doubts in favor of full disclosure . . . ." *United States v. Van Brandy*, 726 F.2d 548, 552 (9th Cir. 1984) (citations omitted). Additionally, "[t]he prosecutor's duty to disclose information includes a duty to disclose information known to other agents of the government." *United States v. Fort*, 478 F.3d 1099, 1103 (9th Cir. 2007) (Wardlaw, J., dissenting) (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)).

The prosecution's duty to provide the defense with *Brady* material exists "regardless of whether the defense made any request of the prosecution; the prosecution is required to provide material, favorable information even 'where the defendant does not make a *Brady* request.'" *Amado*, 758 F.3d at 1134 (quoting *Bagley*, 473 U.S. at 680-82). If the defendant requests specific evidence under *Brady*, she must show that the evidence is material. *United States v. Alvarez*, 358 F.3d 1194, 1211 (9th Cir. 2004); *see also United States v. Stinson*, 647 F.3d 1196, 1208 (9th Cir. 2011) ("A district court need not make such documents available based on 'mere speculation about materials in the government's files.'") (quoting *United States v. Mincoff*, 574 F.3d 1186, 1200 (9th Cir. 2009)). "The test for materiality is whether the requested evidence might affect the outcome of the trial." *Alvarez*, 358 F.3d at 1211 (citing *United States v. Agurs*, 427 U.S. 97, 104 (1976)).

One treatise notes that "*Brady*'s materiality concept, focusing as it does on the effect on the overall result of the trial, is difficult to apply in the pretrial context." *Federal Criminal Discovery* 95. In *United States v. Sudikoff*, 36 F. Supp. 2d 1196 (C.D. Cal. 1999), U.S. District Judge Dean D. Pregerson explained that "[w]hether disclosure would have influenced the outcome of a trial can only be determined after the trial is completed and the total effect of all the inculpatory evidence can be weighed against the presumed effect of the undisclosed *Brady* material." *Id.* at 1198-99. Accordingly, the court asserted that *Brady*'s materiality standard "is only appropriate, and thus applicable, in the context of appellate review." *Id.* at 1198. The court concluded that the proper "pretrial standard under *Brady* is evidence that may reasonably be considered favorable to the defendant's case and that would likely lead to admissible evidence." *Id.* at 1201.

Using this standard, the court considered the defendant's request for "all notes or other evidence of any communication between the government" and an accomplice witness who received immunity in exchange for his testimony. *Id.* at 1197 (quotation marks omitted). The court held that any information in the government's files that demonstrated any variation in the proffered testimony is relevant to the witness's credibility and thus must be disclosed under *Brady*. *Id.* at 1204.

Another district court in the Ninth Circuit took a different approach to considering a defendant's pretrial request for specific information under *Brady*. In *United States v. W. R. Grace* ("*W. R. Grace I*"), 401 F. Supp. 2d 1069 (D. Mont. 2005), then-Chief Judge Molloy explained that:

> *Brady* imposes a self-executing constitutional obligation, and generally is not the proper subject of court rulings prior to trial. This is because any information requested by a defendant that is 'favorable to the accused' under *Brady* is also material under

> Rule 16(a)(1)(E)(i) and therefore must be disclosed under that rule.
> Thus, if the defense knows of the existence of information
> favorable to the accused, it should request that information by
> invoking Rule 16(a)(1)(E). For the prosecution the constitutional
> command of *Brady* goes beyond Rule 16 to require the disclosure
> of information of which the defense *is not* aware. In such cases, the
> government's nondisclosure could not be the subject of a pre-trial
> motion because the defense is not aware the undisclosed
> information exists. Rather, *Brady* violations are generally raised
> and adjudicated post-trial, upon the revelation by the government
> or discovery by the defense of information favorable to the accused
> that should have been disclosed before trial. Only after trial has
> concluded and a complete trial record exists may a court analyze
> whether information the government has not produced constitutes a
> *Brady* violation.

*Id.* at 1076-77 (footnote omitted) (emphasis in original).[1] Accordingly, the court construed the

defendants' requests for specific information under *Brady* as motions to compel under

Rule 16(d)(2), and analyzed the requests under the requirements of Rule 16(a)(1)(E). *Id.* at 1077.

The court concluded that the "requirements of *Brady* play no role in deciding whether

information identified and requested by Defendants must be produced. Those disputes are

properly decided under Rule 16(a)(1)(E)." *Id.*

Despite the difficulty of applying *Brady*'s materiality analysis in the pretrial context, this

Court must follow Ninth Circuit law. The Ninth Circuit instructs that "in a case like this, in

which the defendant requests specific evidence under *Brady*, he must show that it is material.

The test for materiality is whether the requested evidence might affect the outcome of the trial."

---

[1] Judge Molloy's analysis in *W. R. Grace I* relied, in part, upon the Advisory Committee
Notes to Rule 16, which state: "Although the Advisory Committee decided not to codify the
Brady Rule, the requirement that the government disclose documents and tangible objects
'material to the preparation of his defense' underscores the importance of disclosure of evidence
favorable to the defendant." 401 F. Supp. 2d at 1076 n.5 (quoting Advisory Committee's Note to
1975 Amendments, Rule 16).

*Alvarez*, 358 F.3d at 1211.[2] In *United States v. Michaels*, 796 F.2d 1112 (9th Cir. 1986), the

Ninth Circuit considered whether a district court abused its discretion in denying the defendant's

pretrial request for the production of rough witness interview notes under *Brady*. *Id.* at 1115. The

defendant, who was charged with mailing an explosive device, among other crimes, argued that

the postal inspectors' rough notes are material to his defense because the notes could have

included evidence that the package containing the explosive device was not actually mailed. *Id.*

The defendant additionally argued that the rough interview notes are more accurate than the

typed interview summaries the government provided to him in discovery. *Id.*

The defendant, however, did not provide any reason "for believing that the notes contain

significant material that is not contained in the typed summaries he already possesses," nor did

the defendant provide any basis for his assertion that the notes were inherently more reliable than

the summaries. *Id.* at 1116. The Ninth Circuit reasoned in part as follows:

> "[T]he appellant['s] mere speculation about materials in the
> government's files [does not require] the district court or this court
> under *Brady* to make the materials available for [the appellant's]
> inspection." *United States v. American Radiator & Standard
> Sanitary Corp.*, 433 F.2d 174, 202 (3d Cir. 1970). Nor does *Brady*
> "require the trial court to make an *in camera* search of the
> government files for evidence favorable to the accused." *United
> States v. Harris*, 409 F.2d 77, 80-81 (4th Cir. 1969). *Brady* does
> not establish a "duty to provide defense counsel with unlimited
> discovery of everything known by the prosecutor." *United States v.*

---

[2] The Court notes, however, that *Alvarez* does not provide clear guidance on how a
district court should conduct this test. In *Alvarez*, the defendant made a pretrial request for *Brady*
material that he alleged the government failed to provide. 358 F.3d at 1210. The defendant
argued that prior statements of the witnesses who testified against him, as well as government
agents' notes of pretrial interviews with the witnesses, are *Brady* and Jencks Act material that is
required to be disclosed before trial. *Id.* The Ninth Circuit held that the defendant failed to make
a showing of materiality under *Brady* because he was effectively able to impeach the relevant
witness at trial, and "therefore the government's production of the agents' interview notes would
not have affected the outcome of the trial." *Id.* at 1211. Thus, the Ninth Circuit in *Alvarez*
applied an after-the-fact analysis that does not aid a district court in determining what
information may be material under *Brady* in the pretrial context.

> *Agurs*, 427 U.S. 97 (1975). Rather, in a case in which a specific request for evidence is made, "the test for materiality is whether the requested evidence might affect the outcome of the trial." *Id.* at 104; *United States v. Goldberg*, 582 F.2d 483, 488 (9th Cir. 1978).

*Id.* at 1116 (first alteration added). The Ninth Circuit concluded that because the defendant did not show that the rough interview notes "would be likely to affect the outcome of the trial" and were thus material to his defense, the district court did not abuse its discretion in finding that the defendant was not entitled to their production under *Brady*. *Id.*

## BACKGROUND

### A. Allegations in the Indictment

In 2004, Yates and Heine co-founded the Bank, a financial institution engaged in the business of personal and commercial banking and lending. The Bank is headquartered in Lake Oswego, Oregon. Heine served as the Bank's President and Chief Executive Officer ("CEO"). As President and CEO, Heine supervised and managed the Bank's affairs and operations. Heine was also a member of the Bank's Board of Directors (the "Board"). Heine left the Bank in 2014. Yates, a certified public accountant, served as the Bank's Executive Vice President and Chief Financial Officer ("CFO"). As CFO, Yates was responsible for ensuring the Bank's compliance with state and federal regulations. Yates was also the Secretary of the Board. She resigned from the Bank in March 2012.

Both Yates and Heine were responsible for ensuring that the Bank operated in a sound and safe manner and for keeping the Board informed about the Bank's financial condition and the adequacy of the Bank's policies, procedures, and internal controls. Additionally, Yates and Heine were members of the Bank's Internal Loan Committee (the "ILC"). The duties of the ILC included approving loans that were outside the authority of individual Bank loan officers, ensuring the quality of the Bank's loan portfolio, and minimizing risks in that portfolio.

On June 24, 2015, a federal grand jury issued a 27-count indictment (the "Indictment") against both Yates and Heine for alleged conduct related to their time with the Bank. The Indictment charges Yates and Heine with one count of conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349, and 26 counts of making false bank entries, reports, and transactions, in violation of 18 U.S.C. § 1005. The Indictment alleges that beginning in about September 2009 and continuing through at least September 2014, Yates and Heine conspired to defraud the Bank by means of materially false representations and promises. The Indictment further alleges that the purpose of the conspiracy was to conceal the true financial condition of the Bank from the Board, the Bank's shareholders, regulators, and the public. According to the Indictment, Yates and Heine reported false and misleading information about loan performance, concealed information about the status of foreclosed properties, made unauthorized transfers of Bank proceeds, and failed to disclose material facts about loans to the Board, shareholders, and regulators, all in an effort to conceal the Bank's financial condition.

The Indictment also names Geoffrey Walsh ("Walsh") as a person who played a role in the alleged conspiracy. Walsh was the former Senior Vice President of Lending at the Bank. In May 2012, the Bank, acting through Heine, terminated the employment of Walsh for cause, in part based on Walsh's alleged misconduct concerning lending practices. Walsh was later indicted and charged in a separate case, *United States v. Walsh*, 3:13-cr-00332-SI-1 (D. Or. 2013), for conspiracy to commit wire fraud, wire fraud, and conspiracy to make false entries in bank records, among other charges. On July 22, 2015, Walsh pleaded guilty to certain charges alleged in a superseding indictment and a second superseding information. In Walsh's plea agreement, he accepted responsibility for acts related to those described in the Indictment against Yates and Heine. Walsh is currently awaiting sentencing.

The Indictment against Yates and Heine alleges five schemes that purportedly advanced

the alleged conspiracy's purpose of creating a healthier appearance of the Bank's finances than

actually existed:

1. Payments Made on Delinquent Loans. The Indictment alleges that Yates and Heine made payments, using Bank proceeds, on behalf of Bank customers who were delinquent on their loans. The payments were sometimes made without the knowledge or consent of the Bank customer. The payments were made so that the delinquent loans would not appear in the "Call Reports."[3] Between approximately September 2009 and May 2012, Yates and Heine directed Walsh to make payments from his personal banking account to the accounts of Bank customers who were delinquent on their loans. On March 31, 2011, Yates transferred funds from a Bank customer's business checking account to the customer's personal loan account, which was delinquent, without the customer's consent. Yates and Heine's alleged practice of paying delinquent loans with Bank or other proceeds hid delinquent loans that would have otherwise been included in the Call Reports and reported to the Board.

2. Wire Transfer and Loan to Bank Customer M.K. The Indictment alleges that between July 2010 and September 2010, Yates and Heine "permitted an unsecured draw for Bank customer M.K. to be made and then approved a $1.7 million loan for the benefit of M.K. in order to conceal the unsecured draw and to pay other Bank borrowers' delinquent loans." Dkt. 1 at 5. Yates approved the $675,000 unsecured draw.

3. Straw Buyer Purchase. The Indictment alleges that from October 2010 through May 2011, Yates and Heine recruited a Bank employee, D.W., "to facilitate a straw buyer purchase of real property located at 952 A Avenue, Lake Oswego, Oregon 97034" (the "A Avenue Property") with the purpose of concealing a loss to the Bank. Dkt. 1 at 7. Yates and Heine gave D.W. two checks totaling $267,727.89 from the Bank's cash account to purchase the A Avenue Property. The Indictment alleges that Yates falsely represented in transactional documents that D.W. funded the purchase personally.

4. Other Real Estate Owned ("OREO") Properties Sold to Bank Customer R.C. The Indictment alleges that from March 2010 through June 2013, Yates and Heine removed two properties from the Bank's OREO account after the properties were sold to a Bank borrower, R.C., "even though the sales did not meet the

---

[3] Federal regulations required the Bank to file with the Federal Deposit Insurance Corporation ("FDIC") on a quarterly basis what are commonly known as "Call Reports." A Call Report contains data about the Bank's financial position and is divided into a number of schedules. One of the schedules, known as "Schedule RC-N," requires disclosure of the full value of outstanding loans.

requirements to remove the properties from the account." Dkt. 1 at 9. Yates and Heine did not require R.C. to make any down payment and provided R.C. with full financing from the Bank for both properties. As a result of the transactions, the properties were no longer reported on the Call Reports as OREO assets. On January 24, 2011, FDIC examiners questioned the validity of the removal of the properties from the Bank's OREO account and advised Yates and Heine that the purchases did not meet the minimum equity requirements needed to remove the properties. Yates advised the FDIC examiners that R.C. was going to make down payments for the two homes, which would then permit the Bank properly to remove the properties from the OREO account. On January 31, 2011, Yates prepared two memos to each of the R.C. loan files that falsely stated R.C. was willing to make a 15 percent down payment on the properties. Yates and Heine represented that R.C. paid down payments for the properties, when in fact no payment was received by the Bank.

5.  <u>Misrepresentation to Shareholders</u>. The Indictment alleges that from September 2009 through September 2014, Yates and Heine caused the Bank to misrepresent to the Bank's shareholders the Bank's Texas Ratio, which is a measure of the Bank's credit troubles, thus misrepresenting the true extent of delinquent loans.

The Indictment further alleges that Yates and Heine knowingly made 26 false entries in the books, reports, and statements of the Bank with the intent to injure and defraud the Bank. According to the Indictment, Yates and Heine did so by omitting material information about the true status of loans and assets from the Call Reports and reports to the Board.

The jury trial on the charges against both Yates and Heine is scheduled to begin on November 1, 2016.

**B. Yates's Previous Motion for Discovery**

On January 25, 2016, Yates filed a Motion for Discovery seeking production of 20 categories of information from the government under Rule 16(a) and *Brady*. Dkt. 99. The Court granted in part and denied in part Yates's Motion for Discovery. Dkt. 182 (March 14, 2016 Order on Defendants' Motions for Discovery). Among other information, Yates requested all disclosures required by Rule 16(a) and all material and information in the government's possession that is material or favorable to Yates on the issue of guilt or punishment, including

any evidence that would tend to impeach any government witness, as required under Rule 16(a) and *Brady*. The Court ordered the government to produce, among other things, all material required under Rule 16(a), *Brady*, and the Jencks Act. Dkt. 182 at 17.

Yates additionally requested in her January 25, 2016 Motion that the Court order the government to produce all original, unedited witness interview notes in the government's possession under *Brady*.[4] Yates argued that the notes are material to her defense because they will provide impeachment evidence. The Court found that Yates's argument rested primarily on speculation and that at that time, Yates failed to make a showing that the requested evidence was material. Dkt. 182 at 19 n.10 (citing *Alvarez*, 358 F.3d at 1211). The Court noted, however, that its ruling does not affect the government's continuing obligation "'to provide material, favorable information even where the defendant does not make a *Brady* request.'" *Id.* (quoting *Amado*, 758 F.3d at 1134). The Court ruled that the government must review all investigative notes in its possession to determine whether the notes contained *Brady* material. Dkt. 182 at 18-19.

### DISCUSSION

In Yates's Motion for Additional Discovery, she requests that the government produce the following information under Rule 16(a) and *Brady*:

> Request No. 1: All documents (whether handwritten or electronic) containing or memorializing communications or interactions between the Bank (through any of its representatives, including its counsel) and any Department of Justice entity, including, but not limited to: (i) FBI agents' timesheets; (ii) FBI agents' calendar entries (whether recorded in hard copy, electronically, or on a personal device); (iii) FBI agents' phone records; and (iv) FBI lead database information.

> Request No. 2: All documents containing statements between, or within, any Department of Justice entities regarding when Yates became a suspect or target in the criminal investigation regarding

---

[4] Heine joined in this request. Dkt. 182 at 19 n.10.

transactions that occurred at the Bank, including but not limited to:
(i) periodic case summary reports provided by line investigators to
supervising personnel; and (ii) FBI lead database information
regarding Yates's status and involvement in the investigation.

Request No. 3: All documents regarding or documenting any
communications between any Department of Justice entity, or
agent of any Department of Justice entity, and Yates, including but
not limited to: (i) FBI agents' memorialization or notes regarding
any contact with Yates (including entries in agent notebooks,
notepads, or calendars); (ii) information regarding how agents set
up interviews with Yates; (iii) any phone records (calls or text
messages) reflecting contact with Yates; (iv) information regarding
how FBI agents understood, framed, or explained the nature of the
interview to Yates; (v) copies of the full chain of any emails sent
between Yates and FBI agents, including any replies or forwards
of these emails by FBI agents and including, but not limited to, the
emails memorialized in the FBI-302 dated May 29, 2013.

Request No. 4: Information regarding how agents responded, or
should have responded according to standard operating procedure,
to Yates's concern on December 13, 2012 that the FBI was
involved in a criminal investigation against her.

Request No. 5: Any FDIC-OIG agent's[5] original notes from
interviews conducted of witnesses concerning the transactions at
issue in the Indictment.

Yates states in her publicly-filed Motion for Additional Discovery that she intends to file a

motion to suppress arguing that the government abused "parallel civil proceedings" (referring to

a civil lawsuit brought by the Bank against Walsh) and that FBI agents elicited involuntary

statements from Yates in violation of her constitutional rights. Yates argues that Request Nos. 1

through 4 seek information material to her anticipated motion to suppress. Yates separately

---

[5] The prosecution team in this case includes an agent from the FDIC Office of the
Inspector General ("OIG").

argues that any FDIC-OIG agent's original, unedited notes are material to her defense and thus must be produced by the government.[6]

To determine whether the information Yates seeks is material under Rule 16(a) and *Brady*, the Court first addresses Yates's arguments regarding her anticipated motion to suppress.[7] The Court then discusses Yates's argument regarding any FDIC-OIG agent's original notes. Finally, the Court addresses each of Yates's five specific requests in turn.

## A. Alleged Abuse of Parallel Civil Proceedings

Yates asserts in her publicly-filed Motion for Additional Discovery that she anticipates moving to suppress statements she made during her deposition in the civil case *The Bank of Oswego v. Geoffrey S. Walsh*, Clackamas County Circuit Court Case No. CV12060128 (the "*Walsh* case" or "*Walsh* proceeding"). Yates states that she intends to argue that the Bank's attorney acted on behalf of the government when he took Yates's deposition and that the government thus abused the existence of the *Walsh* proceeding to elicit incriminating statements from Yates in violation of her Fifth Amendment due process right and her right against self-incrimination.

---

[6] The government responds that the Court has already ruled on whether original, unedited witness interview notes must be produced and argues that under the "law of the case" doctrine, Yates's requests for rough notes should be denied. *See United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) ("Under the 'law of the case' doctrine, 'a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case.'") (quoting *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993)). In the Court's March 14, 2016 Order, however, the Court ruled that "*at this time*, Heine and Yates have failed to make a showing that the requested evidence is material." Dkt. 182 at 19 n.10 (emphasis added). Yates makes arguments in her Motion for Additional Discovery regarding how the requested information is material to her anticipated motion to suppress that she did not raise in her January 25, 2016 Motion for Discovery.

[7] The Court emphasizes that its discussion of Yates's anticipated motion is not commentary upon the merits or content of the anticipated motion.

In the *Walsh* case, the Bank brought suit against Walsh for misappropriation of trade secrets and breach of the duty of loyalty. Dkt. 215-2 at 9-24 (First Amended Complaint in Case No. CV12060128). The Amended Complaint, filed on July 23, 2012, alleges in part that Walsh engaged in misconduct involving a $1.7 million loan for the benefit of Bank customer M.K. *Id.* at 13-16. The M.K. loan is also described in the Indictment in this criminal action against Yates and Heine. Dkt. 1 at 5-6. Although the Amended Complaint alleges that Yates as well as Walsh used the Bank's confidential and proprietary information for her own financial and professional gain, Yates is not a named defendant in the *Walsh* proceeding. Dkt. 215-2 at 17-19.

The Bank's attorney took Yates's deposition pursuant to a subpoena. The deposition began on May 9, 2013.[8] Dkt. 223. Yates was represented by counsel at the deposition. Yates does not identify which allegedly incriminating statements she made during the deposition she will seek to suppress.

In support of her argument that the government abused the existence of the *Walsh* case, Yates discusses case law in which the government itself conducts simultaneous civil and criminal investigations. Generally, "the government may conduct parallel civil and criminal investigations without violating the due process clause, so long as it does not act in bad faith." *United States v. Stringer*, 535 F.3d 929, 936 (9th Cir. 2008) (citing *United States v. Kordel*, 397 U.S. 1, 11 (1970)). In *United States v. Kordel*, the Supreme Court held that the government did not violate the Fifth Amendment rights of corporate executives by using evidence obtained from an FDA civil proceeding in a related criminal prosecution against the executives. 397 U.S. at 1. The Court explained that the FDA did not act in bad faith in requesting information from

---

[8] Yates's deposition continued on July 11, 2013. Dkt. 215-2 at 1. The substance of the July 11, 2013 portion of Yates's deposition is not part of the evidentiary record on this Motion.

the executives because the agency regularly does so in its civil investigations. *Id.* at 6. The Court

further reasoned as follows:

> We do not deal here with a case where the Government has
> brought a civil action solely to obtain evidence for its criminal
> prosecution or has failed to advise the defendant in its civil
> proceeding that it contemplates his criminal prosecution; nor with
> a case where the defendant is without counsel or reasonably fears
> prejudice from adverse pretrial publicity or other unfair injury; nor
> with any other special circumstances that might suggest the
> unconstitutionality or even the impropriety of this criminal
> prosecution.

*Id.* at 11-12 (footnotes omitted). Thus, the Court concluded that "[o]verturning these convictions

would be tantamount to the adoption of a rule that the Government's use of interrogatories

directed against a corporate defendant in the ordinary course of a civil proceeding would always

immunize the corporation's officers from subsequent criminal prosecution." *Id.* at 12-13.

In *United States v. Stringer*, the Ninth Circuit followed *Kordel* and held, in part, that the

government's use of statements the defendants made to the SEC during a civil investigation in

their criminal prosecution for securities violations did not violate their Fifth Amendment right

against self-incrimination. 535 F.3d at 938. The Ninth Circuit explained that although the

government did not notify the defendants about the parallel criminal investigation, the SEC

sufficiently advised the defendants in the civil investigation that any evidence the SEC obtained

could be used in a criminal proceeding. *Id.* at 937-38. The Ninth Circuit concluded that the

defendants forfeited any claims regarding the privilege against self-incrimination when they did

not invoke the Fifth Amendment during SEC depositions. *Id.* at 938.

In *Stringer*, the Ninth Circuit also considered whether the government's use of a parallel

investigation violated the defendants' due process and Fourth Amendment rights. *Id.* at 937-41.

The Ninth Circuit found that the SEC's civil proceeding against the defendants was not a pretext

for the criminal investigation, and thus no due process violations occurred. *Id.* at 939. With

regard to the defendants' Fourth Amendment claims, the Ninth Circuit explained that a

consensual search may be unreasonable under the Fourth Amendment "if the consent is obtained

by trickery or deceit. . . ." and that "[a] government official must not 'affirmatively mislead' the

subject of parallel civil and criminal investigations 'into believing that the investigation is

exclusively civil in nature and will not lead to criminal charges.'" *Id.* at 939-40 (quoting *United

States v. Robson*, 477 F.2d 13, 18 (9th Cir. 1973)). The Ninth Circuit held that because the SEC

did not make any affirmative misrepresentations regarding the civil investigation, the

government's actions did not constitute an unreasonable search or seizure. *Id.* at 940-41.

Yates first argues that FBI agents misled her into believing that she was only a

cooperating witness, rather than a suspect, in their criminal investigation. Yates points to an FBI

report of a December 13, 2012 telephone interview with Yates. Dkt. 215-2 at 2. The report states

that Yates expressed concern that she was under investigation by the FBI. *Id.* In response, the

interviewing agents advised Yates that the investigation was ongoing. *Id.* Yates argues that

because the FBI agents did not explicitly notify her that she was a target or had the possibility of

becoming a target in the criminal investigation, the FBI agents' response was in bad faith.[9]

---

[9] Yates cites to *United States v. Tweel*, 550 F.2d 297 (5th Cir. 1977), to argue that FBI agents misled her into believing that she was not a target in the criminal investigation. In *Tweel*, the defendant was convicted of tax evasion, among other charges. *Id.* at 298. During the audit that led to the defendant's indictment, the defendant's accountant asked the IRS agent performing the audit whether a special agent of the Intelligence Division was involved, thus making the audit criminal rather than civil. The IRS agent responded in the negative, leading the accountant to believe that the audit was civil although it was in fact conducted at the specific request of the Department of Justice's Organized Crime and Racketeering Section. The Fifth Circuit found that the IRS agent's failure to notify the defendant of the "obvious criminal nature" of the investigation amounted to a "silent misrepresentation [that] was both intentionally misleading and material." *Id.* at 299. The Fifth Circuit held that because the defendant's consent to the IRS agent's copying of documents was "obtained by deception," the government acquired the defendant's records through an unreasonable search in violation of the Fourth Amendment. *Id.* at 300. *Cf. Robson*, 477 F.2d at 18 (holding that the defendant's consent to an IRS agent's search of records was not the product of deception where the IRS agent did not represent that the

According to Yates, she would not have complied with the civil deposition subpoena in the *Walsh* case had she accurately been informed by the FBI agents that she was facing criminal exposure.

Yates also argues that the Bank's attorney acted on behalf of, and as an agent of the government when he took her deposition in the *Walsh* case and that unlike in *Stringer*, she was not advised that statements she made during the deposition could be used against her in a criminal proceeding. The Ninth Circuit instructs that a Fourth Amendment violation might occur when a private person acts "as an instrument or agent of the state" in conducting a wrongful search or seizure. *United States v. Black*, 767 F.2d 1334, 1339 (9th Cir. 1985) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 487-90 (1971)); *United States v. Miller*, 688 F.2d 652, 656 (9th Cir. 1982)). The critical factors in this analysis are "(1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the party performing the search intended to assist law enforcement efforts or to further his own ends." *Black*, 767 F.2d at 1339 (quoting *Miller*, 688 F.2d at 657).

In support of her argument that the Bank's attorney was acting as an agent of the government when he took Yates's deposition, Yates points to the fact that FBI agents interviewed the Bank's attorney several times before Yates's May 9, 2013 deposition in the

---

audit was only civil in nature and there was no evidence that IRS agent was asked about the scope of his investigation).

In *Tweel*, the Fifth Circuit was concerned about the government misleading an individual into thinking that he was providing information for a civil audit when the government was in fact gathering information for a criminal investigation. Thus, Yates's conversations with FBI agents during the course of their criminal investigation may be distinguished from the defendant's interactions with the IRS agent in *Tweel*. Yates argues, however, that under *Tweel* and *Robson*, the government had a continuing obligation to notify Yates about her target status following her December 13, 2012 statement that she was concerned whether she was under investigation by the FBI.

*Walsh* case. *See* Dkt. 215-2 at 3-5. For example, on April 30, 2013, the Bank's attorney provided the FBI with information regarding the A Avenue straw buyer scheme described in the Indictment. Dkt. 215-2 at 5. During Yates's deposition less than two weeks later, the Bank's attorney asked Yates about subjects including the A Avenue transaction, the wire transfer to M.K., and the loans to R.C. Dkt. 215-1 at 70-93; 2-69; 94-115. Although the Bank's Amended Complaint alleges that Walsh engaged in misconduct related to the loan to M.K., the Amended Complaint does not explicitly mention the A Avenue transaction or the loans to R.C. The Indictment, however, describes all three subjects.

On June 6, 2013, an FBI agent again interviewed the Bank's attorney. Dkt. 215-2 at 8. During the June 6, 2013, interview, the Bank's attorney notified the FBI agent of Yates's recent deposition. According to the FBI report of the interview, the Bank's attorney commented that Yates's answers during the deposition were evasive and implied that Yates would inappropriately authorize wire transfers for Bank customers. *Id.*

Yates argues that the requested information will aid her analysis of the nature of the interactions between the Bank's attorney and the government and is thus material to preparing her anticipated motion to suppress. The government disputes that the Bank's attorney worked as an instrument or agent of the government before, during, or after Yates's deposition in the *Walsh* case, and attaches a declaration from the Bank's attorney to that effect. Yates, however, has presented facts that the Bank's attorney spoke about her deposition with the government and commented upon the potentially incriminating nature of Yates's statements and demeanor during the deposition. Thus, if the government is in possession of communications between the Bank's attorney and the government that the government has not already disclosed in discovery, this information may be helpful to Yates's defense theory that the government "knew of and

acquiesced" in her deposition or whether the Bank's attorney "intended to assist law enforcement efforts or to further his own [client's] ends" when he deposed Yates. *See Black*, 767 F.2d at 1339 (quotation marks omitted).

## B.  Alleged Elicitation of Involuntary Statements

Yates also asserts that she intends to argue that the FBI agents elicited involuntary statements from Yates by deliberately deceiving her regarding the nature of their investigation and her status as a cooperating witness. According to Yates, she was particularly susceptible to the FBI agents' allegedly misleading approach because of her belief in her own innocence and her lack of experience in the criminal justice system.

Yates does not specifically identify the statements she made to the FBI that she will seek to suppress, nor does she indicate that she was in custody or detained during any of the applicable interviews. Yates also does not provide the Court with any factual details regarding the interviews apart from her December 13, 2012 discussion with the FBI agents during which she expressed concern that she was under investigation. The FBI report of the December 13, 2012 interview does not state that Yates was advised of her right against self-incrimination.

The government may not use a defendant's statements against her at trial if the statements were given involuntarily. *United States v. Preston*, 751 F.3d 1008, 1010 (9th Cir. 2014). In determining whether a statement was given voluntarily, courts must "take[] into consideration the totality of all the surrounding circumstances—*both* the characteristics of the accused *and* the details of the interrogation." *Id.* at 1016 (emphasis in original) (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). Some of the factors courts consider include the defendant's age, education, intelligence, and knowledge of her rights; the duration and nature of detention or questioning; and whether physical punishment was used or threatened. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). "Ultimately, the voluntariness determination 'depend[s]

upon a weighing of the circumstances of pressure against the power of resistance of the person

confessing.'" *Preston*, 751 F.3d at 1016 (alteration in original) (quoting *Dickerson*, 530 U.S.

at 434).

Generally, "the 'good guy' approach is recognized as a permissible interrogation tactic."

*Miller v. Fenton*, 796 F.2d 598, 607 (3d Cir. 1986). Thus, an interrogator's sympathetic attitude

"is not in itself enough to render a confession involuntary." *Id.* A confession may be involuntary

due to psychological coercion, however, "if other aspects of the interrogation strengthened the

illusion that it was non-adversarial in character." *Id.*; *see also Spano v. New York*, 360 U.S. 315,

319 (1959) (finding a confession inadmissible where the interrogating officer was the

defendant's childhood friend and was directed to "play on [the defendant's] sympathies").

Although law enforcement officers may "make false representations concerning the crime or the

investigation during questioning without always rendering an ensuing confession coerced. . . .

[F]alse promises stand on a different footing." *Preston*, 751 F.3d at 1026 (citing *Frazier v.

Cupp.*, 394 U.S. 731, 739 (1969)); *see also Henry v. Kernan*, 197 F.3d 1021, 1027-28 (9th Cir.

1999) (finding a defendant's confession involuntary where detectives made "misleading

comments [that] were intended to convey the impression that anything said by the defendant

would not be used against him for any purposes").

In *Miller v. Fenton*, a case that Yates heavily relies upon, a murder confession that the

appellant argued was the product of psychological coercion was found by the Third Circuit to be

voluntary and thus admissible. 796 F.2d at 601. The Third Circuit described the interrogation in

part:

> It is clear that [Detective] Boyce made no threats and engaged in
> no physical coercion of Miller. To the contrary, throughout the
> interview, Detective Boyce assumed a friendly, understanding
> manner and spoke in a soft tone of voice. He repeatedly assured

> Miller that he was sympathetic to him and wanted to help him
> unburden his mind. . . . Boyce also gave Miller certain factual
> information, some of which was untrue. At the beginning of the
> interrogation, for example, Boyce informed Miller that the victim
> was still alive; this was false. During the interview, Boyce told
> Miller that [the victim] had just died, although in fact she had been
> found dead several hours earlier. . . . Detective Boyce led Miller to
> understand that he believed that Miller had committed the crime
> and that Miller now needed a friend to whom he could unburden
> himself. The Detective stated several times that Miller was not a
> criminal who should be punished, but a sick individual who should
> receive help.

*Id.* at 601-602. The Third Circuit explained that although the detective's friendly manner and

promises of psychiatric help "may have been a form of psychological trickery," those aspects of

the interrogation did not affect the voluntariness of the confession. *Id.* at 612. The Third Circuit

reasoned that the defendant's personal characteristics, including his age, intelligence, and

previous experience in the criminal justice system, "rendered him resistant" to the detective's

persuasive tactics. *Id.* The Third Circuit also noted that the defendant made remarks throughout

the interrogation "that indicate[d] that he knew that this was an ordinary police interrogation,

rather than an encounter with a compassionate friend, and that he was aware that a confession

would result in criminal prosecution and possibly in conviction and sentence." *Id.*

According to Yates, her statements to FBI agents were elicited involuntarily because the

FBI agents used implied promises to convince Yates that she was a cooperating witness rather

than a target or potential target of the investigation.[10] Yates argues that unlike in *Miller*, her

individual characteristics, including her lack of experience in the criminal system, make her

particularly susceptible to this tactic. Yates argues that the requested information is material to

---

[10] Yates, however, does not identify any implied or false promises contained in the factual record.

her theory that the FBI agents improperly induced her to make incriminating statements by not revealing the true status of their investigation.

The government responds that the internal FBI notes and the communications that Yates seeks regarding when she became a target in the investigation are not material to a determination of whether her statements to the FBI agents were voluntary. Yates, however, has identified evidence that she expressed concern to FBI agents on December 13, 2012, whether she was a target in their investigation, and that the FBI agents responded in a vague manner. Thus, to the extent the requested information may reveal that Yates was in fact a target of the criminal investigation on December 13, 2012, the requested information may be helpful to Yates's defense theory that the FBI agents' allegedly vague response misled Yates.

## C. Materiality of the FDIC-OIG Agent's Original Notes

Yates argues that she is entitled to the production of any FDIC-OIG agent's original, unedited witness interview notes under Rule 16 and *Brady* because the notes are material to the preparation of her defense. Yates asserts that the Memorandum of Interviews ("MOIs") disclosed to the defense are not a complete record of the interviews conducted by the FDIC-OIG agent. Yates points to the fact that each MOI begins with the statement that "[the witness] voluntarily provided the following information *considered relevant*." Dkt. 215-2 at 26 (Jan. 24, 2013 MOI of Heine Interview), 30 (Jan. 24, 2013 MOI of B.C. Interview) (emphasis added). Thus, Yates argues that the FDIC-OIG agent must have left out information he unilaterally decided was not relevant to the investigation. Yates additionally asserts that the notes "will likely contain" impeachment material, and that "it is expected" that the notes will support Yates's defense that Heine and others manipulated the civil investigation in order to blame Yates for any misconduct regarding the operation of the Bank. Dkt. 208 at 23 (Yates's Motion for Additional Discovery).

The government responds that the phrase "the following information considered relevant" is standard boilerplate language. Yates does not provide any reason for the Court to find otherwise. Yates also does not provide the Court with any facts to support her argument that the unedited witness interview notes may contain impeachment material or that they would otherwise contain relevant information not included in the interview summaries.[11] Thus, Yates merely speculates about what the notes might contain and has not made a "presentation of facts which would tend to show" that any FDIC-OIG agent's original, unedited witness interview notes are "helpful to the defense." *See Muniz-Jaquez*, 718 F.3d at 1183 (quotation marks omitted). Nor has Yates demonstrated that production of the notes "would be likely to affect the outcome of the trial." *See Michaels*, 796 F.2d at 1116.

The Court notes, however, that under Rule 16, the government must disclose to the defendant the following:

> [T]he portion of *any* written record containing the substance of *any* relevant oral statement made before or after arrest if the defendant made the statement in response to interrogation by a person the defendant knew was a government agent[.]

Rule 16(a)(1)(B)(ii) (emphases added). In *United States v. W. R. Grace* ("*W. R. Grace II*"), 401 F. Supp. 2d 1087 (D. Mont. 2005), the court held that in the absence of Ninth Circuit law to the contrary, the plaining meaning of Rule 16(a)(1)(B)(ii) "requires the production of rough interview notes containing the substance of relevant oral statements by the defendants . . . ." *Id.*

---

[11] According to the government, the FDIC-OIG agent's "handwritten notes are not more expansive than his final MOI." Dkt. 220 at 7 (Government's Response to Yates's Motion for Additional Discovery). The FDIC-OIG agent would exclude as irrelevant "small talk or other matters that may be part of a conversation with a witness but not containing anything bearing on the facts of the case. For example, if a witness travelled to attend the interview and a conversation ensued about the witness['s] travel, that information would be deemed not relevant and not included in the MOI. *Nor would such information be reflected in the agent's notes*." *Id.* (emphasis added).

at 1091.[12] The Court agrees with the approach taken in *W. R. Grace II*. Thus, upon the request of a defendant, any handwritten notes containing the substance of any relevant verbal statement made by any defendant must be produced "if the defendant made the statement in response to interrogation by a person the defendant knew was a government agent[.]"[13] *See* Rule 16(a)(1)(B)(ii).

## D.  Yates's Requests for Discovery

Yates makes five specific requests. The Court addresses each request in turn.

### 1.  Request No. 1

In Request No. 1, Yates asks that the government produce the following information:

> All documents (whether handwritten or electronic) containing or memorializing communications or interactions between the Bank (through any of its representatives, including its counsel) and any Department of Justice entity, including, but not limited to: (i) FBI agents' timesheets; (ii) FBI agents' calendar entries (whether recorded in hard copy, electronically, or on a personal device);

---

[12] As the court mentioned in *W. R. Grace II*, other circuit courts disagree as to whether Rule 16(a)(1)(B)(ii) requires the production of any handwritten notes from an interview with a defendant. *Compare United States v. Clark*, 385 F.3d 609, 619 (6th Cir. 2004) (holding that the government is required to produce the rough notes of a defendant's interrogation under Rule 16(a)(1)(B)(ii) although the government already disclosed the interview summary), *and United States v. Molina-Geuvara*, 96 F.3d 698, 705 (3d Cir. 1996) (stating that the government concedes that Rule 16 requires the production of handwritten notes from which the agent's final report of his interview with the defendant was prepared), *with United States v. Brown*, 303 F.3d 582, 590 (5th Cir. 2002) ("The government satisfies its obligation under [Rule 16] when it discloses a 302 report that contains all of the information contained in the interview notes."), *and United States v. Muhammad*, 120 F.3d 688, 699 (7th Cir. 1997) (holding that the government satisfies Rule 16 when it turns over a written summary that contains all of the information from an agent's handwritten notes).

[13] In Yates's January 25, 2016 Motion for Discovery, Yates requested "all oral, written, or recorded statements she made to regulatory or investigating officers or other third parties that are in the government's possession." Dkt. 182 at 19. The Court ruled that the government must produce all of Yates's statements "to the extent required under Rule 16(a), *Brady*, or the Jencks Act." *Id.* The Court now clarifies that the government must produce original, unedited notes containing Yates's statements under Rule 16(a)(1)(B)(ii).

(iii) FBI agents' phone records; and (iv) FBI lead database information.

The government agrees to produce any communication from the Bank to the government as well as any communication to the Bank from the government that have not already been produced in discovery. The government, however, takes the position that the use of "including but not limited to" language is unduly vague and expansive, and presumably includes the U.S. Attorney's Office as a "Department of Justice entity." The government objects to this request insofar as it calls for production of internal communications and specifically objects to the production of: (i) FBI agents' timesheets; (ii) FBI agents' calendar entries; (iii) FBI agents' phone records; (iv) FBI lead database information; and (v) notes of prosecutors or agents.

Request No. 1 Ruling: Yates's Request No. 1 is GRANTED IN PART. The government must produce any communication from the Bank to the government as well as any communication to the Bank from the government that has not already been disclosed in discovery. The government also recognizes that its *Brady* obligations extend to internal communications. Dkt. 220 at 14 (Government's Response to Yates's Motion for Additional Discovery). Yates has not demonstrated that the other documents she requests are material under Rule 16(a) or *Brady*. Thus, the remainder of Request No. 1 is DENIED.

## 2. Request No. 2

In Request No. 2, Yates asks that the government produce the following information:

> All documents containing statements between, or within, any Department of Justice entities regarding when Yates became a suspect or target in the criminal investigation regarding transactions that occurred at the Bank, including but not limited to: (i) periodic case summary reports provided by line investigators to supervising personnel; and (ii) FBI lead database information regarding Yates's status and involvement in the investigation.

The government objects to Request No. 2 insofar as the request calls for production of internal communications. The government maintains its objection to the production of FBI lead database information. The government, however, has agreed "to produce any documents which demonstrate that the FBI or OIG-FDIC sought to 'mislead' Yates about her status in the investigation . . . . [and] any internal documents indicating that she was a subject or target," should such documents exist. Dkt. 220 at 13 (Government's Response to Yates's Motion for Additional Discovery). Additionally, the government states that it "has asked the FBI to review its internal reports and if those reports contain *Brady* information or statements of Yates not otherwise memorialized in a 302 or MOI, that information will be disclosed." *Id.* at 15.

Request No. 2 Ruling: Yates's Request No. 2 is GRANTED IN PART. The government must produce any documents that demonstrate that the FBI or the FDIC-OIG sought to mislead Yates concerning her status in the investigation, should any such documents exist. Additionally, the government must produce any internal documents that indicate whether Yates was a subject or target in the investigation, should any such documents exist. Finally, if any of the FBI's internal reports contain *Brady* information or statements of Yates that have not yet been disclosed in discovery, that information or statement(s) must be disclosed. The remainder of Request No. 2 is DENIED.

### 3.  Request No. 3

In Request No. 3, Yates asks that the government produce the following information:

> All documents regarding or documenting any communications between any Department of Justice entity, or agent of any Department of Justice entity, and Yates, including but not limited to: (i) FBI agents' memorialization or notes regarding any contact with Yates (including entries in agent notebooks, notepads, or calendars); (ii) information regarding how agents set up interviews with Yates; (iii) any phone records (calls or text messages) reflecting contact with Yates; (iv) information regarding how FBI agents understood, framed, or explained the nature of the interview

to Yates; (v) copies of the full chain of any emails sent between
Yates and FBI agents, including any replies or forwards of these
emails by FBI agents and including, but not limited to, the emails
memorialized in the FBI-302 dated May 29, 2013.

The government objects to Request No. 3 insofar as the request calls for production of internal
communications or internal Department of Justice and U.S. Attorney's Office work product. The
government specifically objects to subsection (i) that requests the production of FBI agents'
notes of contacts with Yates, and to the production of prosecutors' notes. The government agrees
to produce all email correspondence between the FBI and Yates or Yates's attorneys to the
extent that it has not already been disclosed in discovery.

Request No. 3 Ruling: Yates's Request No. 3 is GRANTED IN PART. The government
must produce all email correspondence between the FBI and Yates or Yates's attorneys that has
not already been disclosed in discovery. The government must produce original, unedited notes
from government agents' interviews with Yates under Rule 16(a)(1)(B)(ii). The remainder of
Request No. 3 is DENIED.

### 4.  Request No. 4

In Request No. 4, Yates asks that the government produce the following information:

Information regarding how agents responded, or should have
responded according to standard operating procedure, to Yates's
concern on December 13, 2012 that the FBI was involved in a
criminal investigation against her.

The government has agreed to produce any written policy concerning how government agents
are to respond when asked about the nature of an investigation, should any such policy exist.

Request No. 4 Ruling: Yates's Request No. 4 is GRANTED IN PART. The government
must produce any written policy concerning how government agents should respond when asked
about the nature of an investigation or an individual's target status, should any such written
policy exist. The remainder of Request No. 4 is DENIED.

PAGE 30 – OPINION AND ORDER

**5.  Request No. 5**

In Request No. 5, Yates asks that the government produce the following information:

> Any FDIC-OIG agent's original notes from interviews conducted
> of witnesses concerning the transactions at issue in the Indictment.

The government objects to the production of FDIC-OIG agents' notes of interviews. The

government, however, acknowledges its duty to review these notes as well as the notes of the

FBI agents involved in this case for *Brady* material.

<u>Request No. 5 Ruling</u>: Yates's Request No. 5 is GRANTED IN PART. The government

must produce original, unedited notes from any FDIC-OIG agent's interviews with Yates under

Rule 16(a)(1)(B)(ii). The remainder of Request No. 5 is DENIED.

## CONCLUSION

Yates's Motion for Additional Discovery (Dkt. 208) is GRANTED IN PART AND

DENIED IN PART as described in this Opinion and Order.

**IT IS SO ORDERED**.

DATED this 28th day of April, 2016.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge