IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:15-cr-238-SI-2 |
| v. | OPINION AND ORDER ON DEFENDANT DIANA YATES'S MOTION TO SUPPRESS |
| DAN HEINE and DIANA YATES, | |
| Defendants. | |

Billy J. Williams, United States Attorney, and Claire M. Fay, Michelle Holman Kerin, and Quinn P. Harrington, Assistant United States Attorneys, UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF OREGON, 1000 S.W. Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for the United States of America.

Jeffrey Alberts and Mark Weiner, PRYOR CASHMAN, LLP, 7 Times Square, New York, NY 10036; Caroline Harris Crowne and Michael C. Willes, TONKON TORP, LLP, 1600 Pioneer Tower, 888 S.W. Fifth Avenue, Portland, OR 97204. Of Attorneys for Defendant Dan Heine.

Janet Lee Hoffman, Kelsey R. Jones, Andrew T. Weiner, Katherine Feuer, and Douglas J. Stamm, JANET HOFFMAN & ASSOCIATES, LLC, 1000 S.W. Broadway, Suite 1500, Portland OR 97205; Matthew J. Kalmanson, HART WAGNER, LLP, 1000 SW Broadway, Suite 2000, Portland, OR 97205. Of Attorneys for Defendant Diana Yates.

**Michael H. Simon, District Judge.**

Defendants Dan Heine ("Heine") and Diana Yates ("Yates") are charged with conspiring

to commit bank fraud and making false bank entries, reports, and transactions during the time

when they were the two most senior officers of The Bank of Oswego (the "Bank"). ECF 1.
Before the Court is Defendant Yates's Motion to Suppress ("Motion"). ECF 308.

Between November 2012 through June 2013, Yates had several noncustodial interactions
with special agents from the Federal Bureau of Investigation ("FBI"), some of which she
initiated. Yates also had her third-party deposition taken by the Bank on May 9, 2013 in a civil
lawsuit brought by the Bank against another former Bank employee. In her Motion, Yates moves
to suppress two types of statements that she made. First, Yates moves to suppress every
statement that she made to the FBI on the grounds that the agents' allegedly psychologically
coercive tactics rendered Yates's statements involuntary under the Fifth Amendment. Second,
Yates moves to suppress all of the testimony that she gave during her third-party deposition in
the civil lawsuit brought by the Bank against former Bank employee Geoffrey Walsh. In that
lawsuit, styled *The Bank of Oswego v. Geoffrey S. Walsh*, Case No. CV12060128, Clackamas
County Circuit Court ("*Walsh* Lawsuit"), the Bank was represented by an outside law firm.
Yates argues that an attorney with that law firm acted as an agent of the government when he
took Yates's third-party deposition in the *Walsh* Lawsuit. According to Yates, the government
thereby abused the *Walsh* Lawsuit to elicit incriminating statements from Yates in violation of
her Fifth Amendment rights.

The Court held a joint evidentiary hearing to consider Yates's Motion to Suppress and
two additional motions to suppress filed by Defendant Heine. The first day of the hearing was
held on August 22, 2016, and it focused on Heine's first motion. At the request of the parties, the
evidentiary hearing resumed on November 7, 2016, and continued day-to-day until
November 10, 2016. During the five-day suppression hearing (including August 22), the Court

received numerous exhibits and declarations and also heard testimony from the following twelve

witnesses:

1.      Assistant United States Attorney Claire Fay;
2.      FBI Special Agent Matthew Swansinger;
3.      FBI Special Agent Michael Maestas;
4.      FBI Forensic Accountant Glenese Klein;
5.      FDIC-OIG Special Agent Michael Wixted;
6.      FDIC Attorney Lori Honjiyo;
7.      FDIC Field Supervisor Paul Hornberger;
8.      Former FDIC Attorney Lesley Williams;
9.      Former FDIC Investigation Specialist Janie Spaulding;
10.     Attorney Michael Seidl (previously representing Mr. Heine);
11.     Attorney Jeffrey Edelson (representing Ms. Yates in the *Walsh* Lawsuit); and
12.     Attorney Casey Nokes (representing the Bank in the *Walsh* Lawsuit).

The Court has considered all of the evidence and arguments presented by the parties. For the

reasons that follow, the Court denies Yates's Motion to Suppress.

## BACKGROUND

As alleged in the Indictment (ECF 1), in 2004, Heine and Yates co-founded the Bank, a

financial institution engaged in the business of personal and commercial banking and lending.

The Bank is headquartered in Lake Oswego, Oregon.[1] Heine served as the Bank's President and

Chief Executive Officer ("CEO"). As President and CEO, Heine supervised and managed the

Bank's affairs and operations. Heine also was a member of the Bank's Board of Directors (the

"Board"). Heine left the Bank in September 2014. Yates served as the Bank's Executive Vice

President and Chief Financial Officer ("CFO"). As CFO, Yates was responsible for ensuring the

Bank's compliance with federal and state regulations. Yates also was the Secretary of the Board.

Yates resigned from the Bank in March 2012 after disagreements with Heine.

---

[1] On August 12, 2016, the Bank sold loans and other assets to HomeStreet Bank. The Bank of Oswego continues to exist as a corporate entity, but has relinquished its banking charter and now operates as Oswego Resolution. ECF 481 at ¶¶ 3-4 (Decl. of Stephen G. Andrews).

Both Heine and Yates were responsible for ensuring that the Bank operated in a sound and safe manner and for keeping the Board informed about the Bank's financial condition and the adequacy of the Bank's policies, procedures, and internal controls. Additionally, Heine and Yates were members of the Bank's Internal Loan Committee (the "ILC"). The duties of the ILC included approving loans that were outside the authority of individual Bank loan officers, ensuring the quality of the Bank's loan portfolio and minimizing risks in that portfolio.

The Bank is subject to regular monitoring and examinations by the FDIC. For example, federal regulations require the Bank to file with the FDIC what are commonly known as "Call Reports" on a regular basis. A Call Report contains data about the Bank's financial position and is divided into a number of schedules. One of these schedules, known as "Schedule RC-N," requires disclosure of the correct value of outstanding loans.

On June 23, 2015, a federal grand jury returned a 27-count Indictment against both Heine and Yates, alleging misconduct related to their activities with the Bank. The Indictment charges Heine and Yates with one count of conspiring to commit bank fraud, in violation of 18 U.S.C. § 1349, and 26 counts of making false bank entries, reports, and transactions, in violation of 18 U.S.C. § 1005. The Indictment alleges that beginning about September 2009 and continuing through at least September 2014, Heine and Yates conspired to defraud the Bank through materially false representations and promises. The Indictment further alleges that one of the purposes of the conspiracy was to conceal the true financial condition of the Bank from the Board, the Bank's shareholders, the Bank's regulators (including the FDIC), and the public. According to the Indictment, Heine and Yates reported false and misleading information about loan performance, concealed information about the status of foreclosed properties, made

unauthorized transfers of Bank proceeds, and failed to disclose material facts about loans to the Board, shareholders, and regulators, all in an effort to conceal the Bank's financial condition.

The Indictment against Heine and Yates alleges the following five schemes that purportedly advanced the alleged conspiracy's purpose of falsely creating a healthier appearance of the Bank's finances than actually existed:

1. Payments Made on Delinquent Loans. Heine and Yates made payments, using Bank proceeds, on behalf of Bank customers who were delinquent on their loans. The payments sometimes were made without the knowledge or consent of the Bank's customer. The payments were made so that the delinquent loans would not appear in the Call Reports. On March 31, 2011, Yates transferred funds from a Bank customer's business checking account to the customer's personal loan account, which was delinquent, without the customer's consent. Heine and Yates's alleged practice of paying delinquent loans with Bank or other proceeds hid delinquent loans that otherwise would have been included in the Call Reports and reported to the Board.

2. Wire Transfer and Loan to Bank Customer M.K. Between July 2010 and September 2010, Heine and Yates permitted to be made an unsecured draw in the amount of $675,000 for Bank customer M.K. and then approved a $1.7 million loan for the benefit of M.K. in order to conceal the unsecured draw and to pay other Bank borrowers' delinquent loans. Yates approved the unsecured draw.

3. Straw Buyer Purchase. From October 2010 through May 2011, Heine and Yates recruited a Bank employee, Daniel Williams ("Williams"), to facilitate a straw buyer purchase of real property located at 952 A Avenue, Lake Oswego, Oregon 97034 (the "A Avenue Property") for the purpose of concealing a loss to the Bank. Heine and Yates gave Williams two checks totaling $267,727.89 from the Bank's cash account to purchase the A Avenue Property. Yates falsely represented in transactional documents that Williams funded the purchase personally.

4. Other Real Estate Owned ("OREO") Properties Sold to Bank Customer R.C. From March 2010 through June 2013, Heine and Yates removed two properties from the Bank's OREO account after the properties were sold to a Bank borrower, R.C., even though the sales did not meet the requirements to remove the properties from the account. Heine and Yates did not require R.C. to make any down payment and provided R.C. with full financing from the Bank for both properties. As a result of the transactions, the properties were no longer reported on the Call Reports as OREO assets. On January 24, 2011, FDIC examiners questioned the validity of the removal of the properties from the Bank's OREO account and advised Heine and Yates that the purchases did not meet the

minimum equity requirements needed to remove the properties. Yates advised the FDIC examiners that R.C. was going to make down payments for the two homes, which would then permit the Bank properly to remove the properties from the OREO account. On January 31, 2011, Yates prepared two memos to each of the R.C. loan files that falsely stated R.C. was willing to make a 15 percent down payment on the properties. Heine and Yates represented that R.C. paid down payments for the properties, when in fact no payment was received by the Bank.

5. <u>Misrepresentations to Shareholders.</u> From September 2009 through September 2014, Heine and Yates caused the Bank to misrepresent to the Bank's shareholders the Bank's "Texas Ratio," which is a measure of the Bank's credit troubles and potential for bank failure, thus misrepresenting the true extent of the Bank's delinquent loans.

ECF 1 at 4-11, ¶¶ 13-26. The Indictment further alleges that Heine and Yates knowingly made 26 false entries in the books, reports, and statements of the Bank with the intent to injure and defraud the Bank. Heine and Yates allegedly did so by omitting material information about the true status and condition of loans and assets from the Call Reports and reports to the Board. *Id*. at 12-14.

The Indictment also names Geoffrey Walsh ("Walsh") as a person who played a role in the alleged conspiracy. Walsh was the former Senior Vice President of Lending at the Bank. In May 2012, the Bank, acting through Heine, terminated the employment of Walsh for cause, in part based on Walsh's alleged misconduct concerning lending practices. In July 2013, Walsh was indicted and charged in a separate case for conspiracy to commit wire fraud, wire fraud, and conspiracy to make false entries in bank records, among other charges. *United States v. Walsh*, Case No. 3:13-cr-00332-SI-1 (D. Or.) ("*Walsh* Criminal Action"). On July 22, 2015, Walsh pleaded guilty to certain charges alleged in a superseding indictment and second superseding information in the *Walsh* Criminal Action. In Walsh's plea agreement, he accepted responsibility for his role in many of the same acts described in the Indictment against Heine and Yates. Walsh is awaiting sentencing.

## FINDINGS OF FACT

The Court finds the following facts by a preponderance of the evidence.

### A.  Early Stages of the FDIC's Civil Investigation and the FBI's Criminal Investigation

On December 15, 2009, the FDIC issued a Safety and Soundness Examination Report, finding "less than satisfactory conditions" at the Bank. ECF 354 at 38 (Gov't Ex. AA). In an effort to correct these conditions, the Bank and the FDIC entered into a Memorandum of Understanding ("MOU") on June 1, 2010. *Id.* at 37-41. Under the MOU, the Bank agreed to provide additional reporting to the FDIC and to meet certain financial benchmarks. *Id.* On January 24, 2011, the FDIC and the Oregon Division of Finance and Corporate Securities began a joint examination of the Bank. ECF 320-10 at 1-2 (Heine Ex. J).

On May 29, 2012, Heine filed a Suspicious Activity Report ("SAR"), naming Yates. ECF 327-1 at 14-20 (Yates Ex. 6). The SAR asserts, among other things, that Yates contacted Bank customers and third parties regarding customers' confidential information after her departure from the Bank in March 2012. *Id.* at 19. The SAR also describes improper lending practices on the part of Walsh. *Id.* As alleged in the SAR, Yates knew of and signed off on many of Walsh's allegedly improper loans. *Id.*

In June 2012, Heine called the FBI to report alleged criminal activity conducted by Walsh. ECF 354 at 29-33 (Gov't Ex. BB). Heine reported that Walsh improperly used customer funds to make loans to other customers that the Bank ordinarily would not have approved. *Id.* at 31. Heine also stated that Yates may have been involved with Walsh's allegedly improper activities because she approved many of the loans at issue. *Id.* Grand jury proceedings against Walsh began soon thereafter. ECF 320-3 (Heine Ex. C). On July 17, 2012, the FBI executed search warrants on Walsh's home. ECF 362-1 (Gov't Ex. EE).

By July 18, 2012, the FDIC told the FBI that it was pursuing a "Walsh/Yates" investigation. ECF 327-1 at 21 (Yates Ex. 7). Later that month, FBI agents met with FDIC representatives to discuss their respective investigations into alleged misconduct at the Bank. *Id.* at 22-23 (Yates Ex. 8). The FDIC advised the FBI that it would continue its investigation into Walsh's lending practices and report any information to the FBI that would support the criminal investigation. *Id.* at 23.

In the fall of 2012, the Bank provided the FBI with additional information about the conduct of Yates and Walsh, including information that the Bank obtained as a result of its own internal investigation. *Id.* at 26-28, 32 (Yates Exs. 10, 11, 13). The Bank generally provided this information pursuant to grand jury subpoenas. *See, e.g.*, *id.* at 28, 32.

## B.  The Bank's Civil Lawsuit Against Walsh

In June 2012, the Bank sued Walsh, claiming misappropriation of the Bank's trade secrets and breach of the duty of loyalty. The Amended Complaint in the *Walsh* Lawsuit alleged, among other things, that Walsh engaged in misconduct involving a $1.7 million loan to Bank customer M.K. Although the Amended Complaint in the *Walsh* Lawsuit alleged that Yates, as well as Walsh, used the Bank's confidential and proprietary information for her own financial and professional gain, Yates was not named by the Bank as a defendant in the *Walsh* Lawsuit.

On May 9, 2013, an attorney with the Bank's outside law firm that was handling the *Walsh* Lawsuit, Mr. Casey Nokes ("Nokes"), took Yates's third-party deposition in the *Walsh* Lawsuit, pursuant to a civil subpoena. At her deposition, Yates was represented by attorney Jeffrey M. Edelson ("Edelson"). During the Yates deposition, Nokes questioned Yates about a number of subjects, including the A Avenue transaction, a wire transfer from the Bank to its customer M.K., and certain loans made by the Bank to R.C. The parties in the *Walsh* Lawsuit agreed to a stipulated protective order, which was entered by the court. Under that stipulated

protective order, the transcript of Yates's deposition would be treated as confidential, but could be disclosed to "[a]ppropriate law enforcement officials" without prior consent. ECF 362-3 (Gov't Ex. GG) at ¶ 8(f).[2]

Nokes did not receive any direction, instruction, or suggestion from the FBI, the FDIC, the U.S. Attorney's Office, or any other part of the federal or state government on any aspect of civil discovery or otherwise during Nokes's representation of the Bank in the *Walsh* Lawsuit. No one from the government asked the Bank or its counsel to take Yates's deposition in the *Walsh* Lawsuit or requested that any specific questions be asked of Yates during her deposition or suggested that the deposition cover any particular topics or issues. In taking Yates's deposition on May 9, 2013 in the *Walsh* Lawsuit, Nokes acted solely in the interest of his client, the Bank, without any governmental involvement.

On June 4, 2013, however, several weeks after the Yates deposition was taken, Nokes left a voicemail message for FBI Special Agent Matthew Swansinger. On June 6, 2013, Nokes spoke with Swansinger and stated that during her deposition Yates's statements were "evasive or incredible and plain silly." Nokes further advised Swansinger that Yates testified that she had authorized wire transfers for Bank customers "if they were good for it." Nokes also asked Swansinger whether the Bank was still considered by the FBI to be a victim. Special Agent Swansinger replied that the investigation was still active "based upon information provided by

---

[2] Yates asserts that it is unusual for a stipulated protective order in a civil lawsuit to provide that otherwise confidential information may be disclosed to law enforcement without prior consent. The Court agrees. The record, however, contains no evidence explaining either the origin or purpose of that clause. Yates also asserts that under the protective order, a party may only use documents designated as confidential for "the prosecution or defense" of the *Walsh* Lawsuit "and for no other purpose." ECF 362-3 (Gov't Ex. GG) at ¶ 6. The parties designated Yates's deposition transcript as confidential. Yates Ex. 63. The Court, however, need not resolve whether the Bank's disclosure to the FDIC of Yates's deposition transcript violated the protective order in the *Walsh* Lawsuit entered in state court.

the bank and others." ECF 327-3 at 2 (Yates Ex. 33). Two months later, in August 2013, the U.S. Attorney's Office requested from the FDIC and received a copy of the transcript of Yates's deposition taken by the Bank in the *Walsh* Lawsuit. ECF 362-5 at 1-2 (Gov't Ex. II at 1-2).[3]

## C. Yates's Interactions with Federal Investigators

From November 2012 through August 2013, Yates provided information both to the FBI and the FDIC. On December 13, 2012, Yates spoke with FBI Special Agent Swansinger and FBI Special Agent Michael L. Maestas. *Id.* at 65 (Yates Ex. 17). Yates reported to the agents that she had received a telephone call from an employment "headhunter" with whom Yates had been working to try to find new employment. Yates explained that the headhunter told Yates that the headhunter recently had spoken with Heine and that Heine had said that Yates was under investigation by the FBI. *Id.* Yates told the FBI agents that she was concerned by Heine's statement. *Id.* As described in the FBI's FD-302 form that memorialized the interaction, the FBI agents advised Yates that they were interviewing her regarding transactions that occurred at the Bank and that their case was still under investigation. *Id.* Yates's own notes of the interaction, however, read:

> 12.13.12 DY [Diana Yates] contacts FBI to ensure that I am not under any type of legal investigation. The FBI-Matt Swansong [*sic*] is surprised that I am asking the questions and ensures me that I am not. States that no one has been charged and that I may be called for a potential witness if they move forward. They provide no assurance that their investigation is going anywhere. Seem surprised that Dan Heine would say such things as they are the FBI and do not tell anyone who they are investigating. State that they are not working for Dan Heine.

---

[3] On or about June 21, 2013, Nokes, the Bank's attorney in the *Walsh* Lawsuit, sent a copy of the transcript of the Yates deposition from May 9, 2013 to the FDIC, along with the exhibits from that deposition. Yates Ex. 185; Yates Ex. 188 at 2.

*Id.* at 62 (Yates Ex. 15).[4] Yates created her notes in early January 2013. ECF 392 ¶ 2 (Supp. Yates Declaration).

According to Yates, at this time she was considering bringing a civil lawsuit against Heine and the Bank on the grounds that they were interfering with her finding new employment. ECF 340 ¶ 5 (Yates Declaration). Yates told Agents Swansinger and Maestas about her possible civil action against Heine and the Bank. *Id.* Yates asserts that during her interview with the FBI on December 13, 2012, the agents led Yates to believe that they would help her build her civil case. Yates believed that, in return, she would help the agents develop their criminal case against Heine. *Id.* ¶¶ 5-6. Yates adds that Agents Swansinger and Maestas "were always friendly with [her], and repeatedly indicated they were on [Yates's] side." *Id.* ¶ 8.

Bonn Phillips, an FDIC Case Manager in the FDIC's San Francisco office, told one of Yates's potential employers that his team at the FDIC was in the process of "conducting an investigation into her actions while she was CFO" because of "concerns with [her] and how she performed at the Bank of Oswego." ECF 327-1 at 63 (Yates Ex. 16). On January 4, 2013, Yates called FDIC Field Supervisor Paul T. Hornberger ("Hornberger"), who was then in the FDIC's Portland office. According to Yates's notes of the phone call, Hornberger told Yates that "there have been no negative comments that have [come] out of his office" about her.[5] *Id.* at 62 (Yates Ex. 15). That same day, Yates emailed to Hornberger at the FDIC a list of grievances concerning Heine's conduct as Bank President and CEO. *Id.* at 9 (Yates Ex. 3). Yates wrote to the FDIC, in part: "I appreciate that the list of incidents remain confidential under the whistle blowing

---

[4] Yates's notes are redacted in the record but appear in Yates's Memorandum in Support of her Motion to Suppress. ECF 328 at 8.

[5] Yates's notes are redacted in the record but appear in Yates's Memorandum in Support of her Motion to Suppress. ECF 328 at 8-9.

statute." *Id.* Hornberger's email response reads, in full: "Thanks—your concerns are noted. pth." *Id.* In May 2013, Yates forwarded her email exchange with the FDIC, including her list of incidents, to FBI Special Agent Swansinger. *Id.*

Yates continued to provide the FBI with information relating to activities at the Bank, including alleged misconduct on the part of Walsh and Heine. *See, e.g.*, ECF 327-3 at 3-8 (Yates Ex. 34) (FD-302 of May 28, 2013 interview with Yates); *Id.* at 9 (Yates Ex. 35) (FD-302 of May 29, 2013 email correspondence with Yates); *Id.* at 54-55 (Yates Ex. 35) (FD-302 of June 3, 2013 interview with Yates); *Id.* at 61-63 (Yates Ex. 38) (FD-302 of June 6, 2013 interview with Yates); ECF 362-8 at 1-2 (Gov't Ex. LL) (FD-302 of June 22, 2013 email from Yates to Special Agent Swansinger); ECF 362-9 at 1-6 (Gov't Ex. MM) (FD-302 of August 15, 2013 email from Yates to Special Agent Swansinger).

On May 3, 2013, Special Agent Michael Wixted of the FDIC's Office of Inspector General ("OIG")[6] emailed to FBI Special Agent Swansinger a draft PowerPoint presentation, summarizing the FDIC's investigation thus far into the conduct of Walsh, Yates, and others. ECF 327-3 at 1 (Yates Ex. 32); ECF 327-2 at 80-113 (Yates Ex. 31). The PowerPoint includes possible charges that could be brought against Yates and others. *Id.*

On Monday, June 3, 2013, FBI Special Agent Swansinger called Yates. She then sent an email to attorney Edelson, who represented Yates during her deposition on May 9, 2013 in the *Walsh* Lawsuit. Yates wrote to Edelson:

> Matt Swansinger, FBI called me again and I mentioned to him some of the concerns. I am planning on meeting them again on

---

[6] The mission of the FDIC's OIG is to investigate fraud, waste, and mismanagement, with a focus on fraudulent transactions. The FDIC's OIG can be characterized as the law enforcement arm of the FDIC and is separate from the civil enforcement and bank examination activities of the FDIC. The FDIC's bank examiners may refer matters to the FDIC's OIG.

> Thursday [June 6, 2013] @3. Can you call Matt at 503.224.4181
> with concerns. Perhaps I am crazy but I trust these guys.

ECF 327-3 at 59 (Yates Ex. 36).[7] After receiving this email from Yates, her attorney, Edelson,

had a telephone conversation with Special Agent Swansinger. ECF 329 ¶ 6 (Edelson

Declaration). According to Edelson, the conversation with Special Agent Swansinger led

Edelson to believe that Yates was not a target of the criminal investigation. *Id.*

As discussed above, on Thursday, June 6, 2013, the Bank's outside attorney Nokes was

interviewed by Special Agent Swansinger, after Nokes had left a voicemail message for

Swansinger on June 4. Nokes stated that Yates recently had been deposed by the Bank in the

*Walsh* Lawsuit. Nokes added that Yates's statements were "evasive or incredible and plain silly"

and that Yates had authorized wire transfers for Bank customers "if they were good for it."

Nokes added that the Bank will be asking the state court in the *Walsh* Lawsuit to lift the

continuance that had been put in place and expected that discovery in that case "will be reopened

against Walsh." Nokes also asked Swansinger whether the Bank "was still being considered a

victim in the case." Swansinger replied that "it was still an active investigation." Yates Ex. 33.

On that same day, Thursday, June 6, 2013, Special Agents Swansinger and Maestas

interviewed Yates at a Starbuck's near her home. Yates described various activities engaged in

by Heine at the Bank. Yates also explained that she had been recently deposed by the Bank in the

*Walsh* Lawsuit. Yates Ex. 38. Although not mentioned anywhere in the FBI's FD-302 statement,

during this meeting Special Agents Swansinger and Maestas asked Yates whether she would be

willing to wear a "wire" secretly to record conversations with Heine. Yates considered the

request, but ultimately declined.

---

[7] The email is redacted in the record but appears in Yates's Memorandum in Support of her Motion to Suppress. ECF 328 at 11.

The next day, June 7, 2013, Assistant U.S. Attorney Claire Fay ("AUSA Fay") sent

Edelson a "proffer letter" for Yates. ECF 327-3 at 68 (Yates Ex. 40). The proffer letter stated, in

relevant part:

> The purpose of your client making a proffer is to provide the
> USAO [the U.S. Attorney's Office] with an opportunity to assess
> the value, extent, and truthfulness of your client's information
> about the criminal activity of the client and others. . . .
>
> Except as outlined herein, the USAO agrees that statements made
> by your client after signing this agreement may not be used in the
> USAO's case-in-chief against your client should a trial be held for
> any charges pending or later filed in the course of this
> investigation.

ECF 362-7 (Gov't Ex. KK). As described in his declaration, Edelson explains:

> The proffer letter appeared to contain standard verbiage that was
> inconsistent with Agent Swansinger's assurances that Ms. Yates
> was not a target. I determined that Ms. Yates would be better off
> relying on Agent Swansinger's promises rather than sign a
> document that contained inaccurate representations. I understood
> that the United States Attorney's Office did not allow changes to
> its standard letter. Therefore, I advised Ms. Yates not to sign it.

ECF 329 ¶ 7.

On June 20, 2013, Edelson and Yates met with AUSA Fay and FBI Special Agents

Swansinger and Maestas. ECF 327-3 at 75-82 (Yates Ex. 44). Yates discussed a range of topics

with AUSA Fay and the special agents, including the A Avenue property, Walsh's allegedly

improper lending practices, and the $675,000 wire transfer loan from the Bank to its customer

M.K. *Id.*

After a conversation on August 9, 2013 with FDIC counsel, Edelson became concerned

that Yates could become, or potentially had already become, a subject of the FDIC civil

investigation, rather than merely a witness. ECF 329 ¶ 9 (Edelson Declaration). Edelson also

assumed that the FDIC could share information with the U.S. Attorney's Office. *Id.* As a result,

Edelson advised Yates to seek the assistance of a criminal defense attorney. *Id.* Even after

receiving this advice, Yates asserts that she continued to believe that her status was only as a

cooperating witness, telling Edelson that she did "not think that the FBI will charge [her]"

because "they have proof that [she] tried to blow the whistle."[8] ECF 327-3 at 71-72 (Yates

Ex. 42).

By October 2013, Yates had retained criminal defense counsel to represent her in both

the FDIC civil investigation and the federal criminal investigation. *See* ECF 362-2 at 1 (Gov't

Ex. FF). On June 26, 2014, AUSA Fay notified Yates's defense counsel that the U.S. Attorney's

Office considered Yates a target in the grand jury investigation into alleged misconduct at the

Bank. *Id.* at 3.

## CONCLUSIONS OF LAW

### A.  Yates's Statements to FBI Agents

Yates moves to suppress all of the statements that she made to FBI special agents on the

grounds that her statements were "involuntary" and thus obtained by the government in violation

of her Fifth Amendment rights. Yates argues that her statements were involuntary because the

FBI engaged in a deception calculated to make Yates believe that she was solely a cooperating

witness and had no criminal exposure in the investigation into the Bank. According to Yates, she

was particularly susceptible to such tactics due to her reasonable belief in her status as a

whistleblower and her lack of experience with the criminal justice system.

The Self-Incrimination Clause of the Fifth Amendment provides that no person "shall be

compelled in any criminal case to be a witness against himself." U.S. CONST., AMEND. V. To

effectuate this right, the government may not use a defendant's statements against her at trial if

---

[8] The email is redacted in the record but appears in Yates's Memorandum in Support of
her Motion to Suppress. ECF 328 at 13.

the defendant gave the statements involuntarily. *See United States v. Preston*, 751 F.3d 1008, 1010, 1015 (9th Cir. 2014). A statement is involuntary for purposes of the Fifth Amendment if it is the product of physical or psychological coercion. *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991). The government has the burden of proving, by a preponderance of the evidence, that a defendant gave a challenged statement voluntarily. *United States v. Bautista*, 362 F.3d 584, 589 (9th Cir. 2004).

An inquiry into the voluntariness of a confession "takes into consideration the totality of all the surrounding circumstances—*both* the characteristics of the accused *and* the details of the interrogation." *Preston*, 751 F.3d at 1016 (emphasis in original) (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). Some of the factors that courts consider include the defendant's age, education, intelligence, and knowledge of her rights; the duration and nature of the detention or questioning; and whether physical punishment was used or threatened. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). "Ultimately, the voluntariness determination 'depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing.'" *Preston*, 751 F.3d at 1016 (alteration in original) (quoting *Dickerson*, 530 U.S. at 434).

Yates argues that the Supreme Court's decision in *Santobello v. New York*, 404 U.S. 257 (1971), and its progeny are applicable in this case. In *Santobello*, the government agreed to not seek the statutory maximum prison sentence in exchange for the petitioner's plea of guilty to a lesser-included offense. 404 U.S. at 258. At sentencing, the government breached this agreement and recommended the maximum sentence. *Id.* at 259. The Supreme Court vacated the trial court's judgment and sentence, concluding "that the interests of justice and appropriate recognition of the duties of the prosecution in relation to promises made in the negotiation of

pleas of guilty will be best served by remanding the case to the state courts for further

consideration." *Id.* at 262-63; *see also United States v. Baird*, 218 F.3d 221, 224, 226 (3d Cir.

2000) (concluding that the government breached a written cooperation agreement when it used

incriminating admissions made as part of the agreement to increase the defendant's punishment

at sentencing).

The Court finds that Yates's comparison to *Santobello* is unpersuasive. Unlike *Santobello*

and its progeny, breach of a plea agreement or cooperation agreement is not at issue in this case.

Nor is there any claim or evidence in the pending matter of any breach of an express promise

made by the government. Rather, Yates argues only that the FBI agents ***impliedly promised***

Yates that she was a witness, and not a suspect, in the criminal investigation.

"Assuredly, interrogating officers can make false representations concerning the crime or

the investigation during questioning without always rendering an ensuing confession coerced.

But false promises stand on a different footing." *Preston*, 751 F.3d at 1026 (citation omitted); *see*

*also Hutto v. Ross*, 429 U.S. 28, 30 (1976) (*per curiam*) (instructing that the test of voluntariness

"is whether the confession was 'extracted by any sort of threats or violence, (or) obtained by any

direct or implied promises, however slight, (or) by the exertion of any improper influence'")

(quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). For example, in *United States v.*

*Preston*, the Ninth Circuit concluded that the district court erred in admitting the defendant's

confession, where the 18-year-old defendant had a severe intellectual impairment; the

interrogating officers engaged in repetitive questioning and threatened that the interrogation

"would continue without end"; and the officers made "false promises of leniency and

confidentiality." 751 F.3d at 1027-28. Similarly, in *Henry v. Kernan*, 197 F.3d 1021 (9th Cir.

1999), the Ninth Circuit held that a defendant's confession was involuntary when the

interrogating officers ignored the defendant's "clear and repeated invocations of his *Miranda* rights" and made "misleading comments intended to convey the impression that anything said by the defendant would not be used against him for any purposes." *Id.* at 1027-28. One of the officers told the defendant that "what you say can't be used against you right now." *Id.* at 1027 (quotation marks omitted).

In support of her argument that the FBI agents impliedly promised Yates that she was a cooperating witness, Yates identifies three occasions during which she asserts the government impliedly misrepresented to her or her civil attorney, Edelson, that she was not under investigation:

1. Yates's December 13, 2012 telephone conversation with Special Agent Swansinger. According to Yates's notes of the telephone call, Swansinger assures Yates that she is not under investigation. Yates's notes also state, however, that Swansinger told her that the FBI "***do[es] not tell anyone who they are investigating***." ECF 327-1 at 62 (Yates Ex. 15) (redacted); ECF 328 at 8 (Yates's Memorandum) (emphasis added). According to the FBI's FD-302 form memorializing the interaction, the FBI advised Yates that when the FBI interviewed her it was regarding transactions that occurred at the Bank, and that the case was still "under investigation." ECF 327-1 at 65 (Yates Ex. 17).

2. Yates's January 2013 telephone conversation with the FDIC's Hornberger and subsequent email to Hornberger in which Yates states that "I appreciate that the list of incidents remain confidential under the whistle blowing statute." *Id.* at 9. According to Yates's notes of the telephone call, the FDIC's Hornberger told Yates that "there have been no negative comments that have [come] out of his office" about her. ECF 327-1 at 62 (Yates Ex. 15) (redacted); ECF 328 at 8-9 (Yates's Memorandum).

3. Edelson's June 6, 2013 telephone call with Special Agent Swansinger and Edelson's statement in his declaration that, based on this conversation, he believed that Yates was not a target of the criminal investigation. ECF 329 ¶ 6.

Yates asserts that, contrary to the government's representations, the "FBI identified Ms. Yates as a target of their investigation by end of October 2012." ECF 328 at 19 (Yates's Memorandum in Support of Motion to Suppress). In support of this proposition, Yates identifies communications from the fall of 2012 from the Bank to FBI Special Agent Swansinger and FBI

Forensic Accountant Klein regarding the $675,000 wire transfer from the Bank to its customer M.K. that implicate Yates in the transaction. ECF 327-1 at 26-27, 32-55 (Yates Exs. 10, 13). In none of the communications identified by Yates, however, all of which are *from* Bank employees *to* the FBI, does any FBI agent state that Yates is a target of their investigation.[9]

In addition, the government argues that under U.S. Department of Justice policy, a "target" is a term of art in federal criminal investigations. A target is defined as: "a person as to whom *the prosecutor or the grand jury has substantial evidence* linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant." U.S. ATTORNEY MANUAL 9-11.151 (emphasis added). As late as October 2013, the federal grand jury and the U.S. Attorney's Office had not yet determined Yates's status in the investigation. ECF 362-2 at 1 (Gov't Ex. FF). It was not until almost one year later, on June 26, 2014, that the U.S. Attorney's Office notified Yates's criminal defense counsel that Yates is a target in the grand jury investigation. *Id.* at 3. Thus, the government argues, the FBI agents' purported assurances that Yates was not a target of the investigation through June 2013 were accurate, even assuming the truth of Yates's version of those statements.

Yates replies that she cannot be expected to understand that the term "target" has a specific meaning with regard to federal criminal investigations. Yates, however, has failed to identify with specificity any false *promise*, either express or implied, made by any government agent in this case. Further, the Court agrees with the government that Yates's personal characteristics support the conclusion that her interactions with government agents were

---

[9] The Court notes, however, that on May 3, 2013, FDIC-OIG Special Agent Wixted emailed FBI Special Agent Swansinger a draft PowerPoint presentation that contained possible charges that could be brought against Yates. *See* ECF 327-3 at 1 (Yates Ex. 32) (email); ECF 327-2 at 80-113 (Yates Ex. 31) (PowerPoint). In Wixted's email to Swansinger, Wixted asks: "Is there anything you want to do on this case?" ECF 327-3 at 1 (Yates Ex. 32). No responsive email from Swansinger appears in the record.

voluntary. Yates is a highly educated, sophisticated banking executive with extensive experience as a CFO in two separate banks. Thus, this case is not like *Preston*, where the defendant was a mentally disabled 18-year-old and particularly susceptible to the interrogating officers' "false promises of leniency." *Preston*, 751 F.3d at 1026.

The Court also finds that the details of Yates's interactions with the government demonstrate voluntariness. Her conversations both with the FBI special agents and the FDIC's personnel, including Hornberger, occurred in noncustodial settings. Indeed, Yates herself initiated several of these interactions. Furthermore, Yates was represented by counsel during the relevant time period. Accordingly, the Court holds that, under the totality of the circumstances, the government has carried its burden of proving the voluntariness of Yates's statements. The Court therefore denies Yates's Motion to Suppress the statements that she made to the FBI while not in custody.

**B.  Yates's Deposition in the Civil Lawsuit *The Bank of Oswego v. Geoffrey Walsh***

Yates also moves to suppress the entirety of her sworn deposition testimony taken in the *Walsh* Lawsuit on the grounds that the government acted in bad faith by using a parallel civil proceeding (the *Walsh* Lawsuit) to elicit incriminating statements from Yates in violation of her Fifth Amendment rights. In support of her argument, Yates discusses inapplicable case law in which the government itself conducted simultaneous civil and criminal investigations, such as the Supreme Court's decision in *United States v. Kordel*, 397 U.S. 1 (1970), and the Ninth Circuit's opinion in *United States v. Stringer*, 535 F.3d 929 (9th Cir. 2008). *See* ECF 328 at 29-31 (Yates's Memorandum in Support of Motion to Suppress). Yates's argument depends entirely upon the unproven premise that Casey Nokes, the Bank's private outside attorney, acted as an agent of the government when he took Yates's third-party deposition in the *Walsh* Lawsuit. *See* ECF 328 at 26-29.

PAGE 20 – OPINION AND ORDER

A private party may be found to have acted "as an 'instrument' or agent of the state" under certain circumstances. *Coolidge v. New Hampshire*, 403 U.S. 443, 488 (1971). The critical factors in this analysis are: "(1) whether the government knew of and acquiesced in the intrusive conduct; and (2) whether the party performing the search intended to assist law enforcement efforts or further his own ends." *United States v. Cleaveland*, 38 F.3d 1092, 1093 (9th Cir. 1994) (quoting *United States v. Reed*, 15 F.3d 928, 931 (9th Cir. 1994). "The ***defendant has the burden*** of establishing government involvement in a private search." *Id.* (emphasis added).

Yates argues that *United States v. Walther*, 652 F.2d 788 (9th Cir. 1981), is analogous to the case at hand.[10] In *Walther*, the Ninth Circuit considered whether the district court erred in granting the defendants' motions to suppress evidence obtained after an airline employee opened a suspicious overnight case, discovered that it contained a white powder substance, and then contacted DEA agents, who confirmed that the substance was cocaine. *Id.* at 790. The defendant had shipped the overnight case as a "Speed Pak." *Id.* Before the trial court, the airline employee testified that he had opened about ten "Speed Paks" in the past and had frequently discovered illegal drugs that he reported to the DEA. *Id.* The employee additionally testified that he only opened the overnight case because he was suspicious that it contained illegal drugs. *Id.* at 792.

---

[10] The Court notes that *Coolidge*, *Cleaveland*, *Reed*, and *Walther* all considered whether private conduct could be considered governmental conduct in the Fourth Amendment context, whereas, here, Yates argues that her Fifth Amendment rights were violated. As Yates points out, however, courts recognize that a private party can violate a defendant's Fifth Amendment rights while acting on behalf of the government. *See, e.g.*, *United States v. Roston*, 986 F.2d 1287, 1292 (9th Cir. 1993) (instructing that a private party may be required to give an individual a *Miranda* warning when the private party is acting on behalf of the state); *United States v. Pace*, 833 F.2d 1307, 1313 (9th Cir. 1987) (finding that a *Miranda* warning was not required where no pre-existing agreement between a cellmate informant and law enforcement existed; the cellmate informant acted on his own initiative in obtaining the defendant's confession; and there was no *quid pro quo* relationship between the cellmate informant and law enforcement).

The Ninth Circuit affirmed the district court's finding that the airline employee was a government agent, explaining that "legitimate business considerations such as prevention of fraudulent loss claims were not a factor" in the airline employee's decision to open the overnight case and that the employee, thus, had the requisite mental state of a government "instrument or agent." *Id.* The Ninth Circuit also concluded that the government acquiesced to the employee's conduct, although the government did not direct the airline employee to open the particular overnight case at issue:

> We are also satisfied that Rivard's [the employee's] prior experience with the DEA provides proof of the government's acquiescence in the search. While the DEA had no prior knowledge that this particular search would be conducted and had not directly encouraged Rivard to search this overnight case, *it had certainly encouraged Rivard to engage in this type of search. Rivard had been rewarded for providing drug-related information in the past. He had opened Speed Paks before, and did so with no discouragement from the DEA. The DEA thus had knowledge of a particular pattern of search activity dealing with a specific category of cargo, and had acquiesced in such activity.*
>
> *We emphasize the narrowness of our holding. It is dependent upon the trial court's finding of extensive contact between Rivard and the DEA and its finding on Rivard's motivation for opening the overnight case.* The DEA either knew or should have known that Rivard had made it a practice to inspect Speed Paks, and had acquiesced in that practice. We do not by this opinion diminish the duty of any private citizen to report possible criminal activity, nor do we frown upon the use of paid informants. We merely hold that the government cannot knowingly acquiesce in and encourage directly or indirectly a private citizen to engage in activity which it is prohibited from pursuing where that citizen has no motivation other than the expectation of reward for his or her efforts.

*Id.* at 793 (emphasis added).

Yates argues that this case is similar to *Walther* because the record establishes extensive and collusive contact between the Bank and Special Agents Swansinger and Maestas. According to Yates, a *quid pro quo* relationship existed between the Bank and the FBI agents such that the

Bank was able to avoid criminal prosecution in exchange for providing incriminating evidence against Walsh and Yates.[11] Yates further argues:

> Though not necessary to establish an agency relationship, it is also probable that FBI agents knew of Ms. Yates's deposition and collaborated with the Bank to conduct it. The FBI agents worked with the Bank extensively during this time. In the month before Ms. Yates's deposition, the FBI agents and attorney Nokes frequently discussed the status of the Bank's civil case against Geoff Walsh. Given the number of discussions they had and the persistent belief in Ms. Yates's culpability, it is highly plausible— and indeed very likely—that attorney Nokes told the agents of Ms. Yates [*sic*] deposition in advance.

ECF 328 at 28 (Yates's Memorandum in Support of Motion to Suppress). Finally, Yates asserts that the similarities between the government's investigation and the questions that Nokes asked Yates during her deposition provide circumstantial evidence that Nokes was acting as the government's agent.

The Court finds that the Bank and its attorney, Nokes, cooperated with federal investigators and complied with grand jury subpoenas both before and after Yates's deposition. For example, on April 30, 2013, Nokes spoke with FBI Special Agent Swansinger and FBI Forensic Accountant Klein about the possible straw buyer purchase of the A Avenue property. ECF 327-2 at 15 (Yates Ex. 24). On June 6, 2013, Nokes notified Agent Swansinger that Yates recently had been deposed in the Bank's civil lawsuit against Walsh. ECF 327-3 at 2 (Yates Ex. 33). According to the FBI report of the interview, Nokes commented that Yates's answers during the deposition were evasive and implied that Yates would inappropriately authorize wire transfers for Bank customers. *Id.*[12]

---

[11] Yates does not identify any evidence in the record that supports this assertion. *See* ECF 328 at 27 (Yates's Memorandum in Support of Motion to Suppress).

[12] Yates also presents evidence that the Bank voluntarily cooperated with the FDIC in its investigation. The Court accepts this conclusion, but it does not alter the result. Neither the Bank

The Court concludes that Yates's comparison of this case to *Walther* is unpersuasive. This case is not like *Walther*, where the DEA "had knowledge of ***a particular pattern of search activity dealing with a specific category of cargo***, and had acquiesced in such activity." 652 F.2d at 793 (emphasis added). Yates has not presented any evidence that the government knew in advance that the Bank would take Yates's deposition, let alone encouraged the Bank to take that deposition, before the June 6, 2013, conversation between Nokes and FBI Special Agent Swansinger. Although the Bank cooperated with the FBI during their investigation into alleged criminal activity at the Bank, the record shows that the communications between the Bank (including its attorney) and government investigators were routine interactions expected from an alleged victim of a case.

Furthermore, Nokes did not receive "any direction, instruction, or suggestion from the Federal Bureau of Investigation, Federal Deposit Insurance Corporation, Department of Justice, or any other part of the federal or state government on any aspect of civil discovery or otherwise" during his time representing the Bank in the *Walsh* Lawsuit. ECF 220-1 ¶ 5. Nokes "acted on [his] own initiative without any government involvement." *Cf. United States v. Roston*, 986 F.2d 1287, 1292 (9th Cir. 1993). Yates's suggestion to the contrary is speculation, unsupported by any record evidence. Accordingly, the Court concludes that Yates has not shown that the "government knew of and acquiesced in" the Bank taking her deposition. *See Cleaveland*, 38 F.3d at 1093.

*Walther* also is different from this case in that the airline employee in that case testified that he only opened the overnight case because he was suspicious that it contained illegal drugs; thus, he did not conduct the search out of ***any*** motivation to carry out the business interests of his

nor its attorneys were agents for the government, including the FBI, the U.S. Attorney's Office, the FDIC, or the FDIC-OIG.

employer. 652 F.2d at 791-92. Unlike in *Walther*, Nokes "has a legitimate independent motivation" for taking Yates's deposition—gathering evidence for the Bank's civil lawsuit against Walsh. *Cf. id.* at 792. According to Nokes, he acted solely in the interests of his private client, the Bank, throughout his representation of the Bank. ECF 220-1 ¶ 4 (Nokes Declaration). Thus, the Court concludes that Nokes did not act "on behalf of" the government when he took the deposition of Yates in the *Walsh* Lawsuit. *Roston*, 986 F.2d at 1292 (quoting *Jones v. Cardwell*, 686 F.2d 754, 756 (9th Cir. 1982)).

Yates has not established that either the Bank or its attorney "intended to assist law enforcement efforts," rather than merely to "further [the Bank's] own ends," in conducting the Bank's civil discovery in the *Walsh* Lawsuit. *See Cleaveland*, 38 F.3d at 1093. Because Yates has not satisfied her burden of establishing government involvement in a private search, *id.*, the Court denies Yates's Motion to Suppress her deposition testimony taken in the *Walsh* Lawsuit.

## CONCLUSION

Yates's Motion to Suppress (ECF 308) is DENIED.

**IT IS SO ORDERED**.

DATED this 18th day of November, 2016.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge