FILED 09 MAR '17 14:49 USDC-ORP

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:15-CR-00238-SI |
| v. | <u>SUPERSEDING INDICTMENT</u> |
| DAN HEINE AND<br>DIANA YATES, | 18 U.S.C. § 2 (Aiding and Abetting)<br>18 U.S.C. § 1005 (False Bank Entries,<br>Reports and Transactions)<br>18 U.S.C. § 1349 (Conspiracy to Commit<br>Bank Fraud) |
| Defendants. | <u>Forfeiture Allegations</u> |

THE GRAND JURY CHARGES:

<u>COUNT 1</u>
CONSPIRACY TO COMMIT BANK FRAUD
(18 U.S.C. § 1349)

At all times material to this Indictment:

1.  The Bank of Oswego ("the Bank"), headquartered in Lake Oswego, Oregon, was engaged in the business of personal and commercial banking and lending. The Bank is a "financial institution," as defined by Title 18, United States Code, Section 20, whose deposits are insured by the Federal Deposit Insurance Corporation (FDIC).

2.  Defendant **DAN HEINE (HEINE)** was founder, president, Chief Executive Officer (CEO), and member of the Board of Directors for the Bank beginning in September 2004 through approximately September 2014. As the CEO and member of the Board of Directors, **HEINE** was responsible for overseeing the Bank's affairs, managing the Bank's day-to-day operations, ensuring the Bank was operated in a sound and safe manner, and keeping Board of

Director members informed about the Bank's financial conditions and the adequacy of its policies, procedures and internal controls.

3.  Defendant **DIANA YATES (YATES)** was a founder, executive vice president, Chief Financial Officer (CFO), certified public accountant (CPA), and the Secretary to the Board of Directors of the Bank from 2004 through approximately March 2012. As the CFO and an officer of the Board of Directors, **YATES** was responsible for ensuring that the Bank was operated in a sound and safe manner, complied with state and federal regulations and keeping Board of Director members informed about the Bank's financial conditions and the adequacy of its policies, procedures and internal controls.

4.  Beginning in or about September 2009 and continuing through at least September 2014, in the District of Oregon and elsewhere, **HEINE, YATES** (collectively **"DEFENDANTS"**) and others known and unknown to the Grand Jury did, unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with each other, and with others, to execute or attempt to execute a material scheme and artifice to defraud the Bank and the Bank's Board of Directors and to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of the Bank by means of material false and fraudulent pretenses, representations, and promises, and omissions of material fact in violation of Title 18, United States Code, Section 1344.

5.  The Bank's elected Board of Directors governed and managed the affairs of the Bank. **DEFENDANTS** met at least monthly with the Bank's Board of Directors and reviewed the Bank's financial status through the submission of monthly Board of Directors Reports. These reports were prepared and signed by the **DEFENDANTS.** The Board of Directors relied upon the information in these reports regarding the Bank's financial condition and ensured that

the Bank was complying with applicable regulations in exercising its oversight of the Bank.

6. The Bank had policies and procedures which were annually approved by the Bank's Board of Directors. These policies and procedures generally followed guidelines and regulations prescribed by the FDIC and were intended to ensure the safe and sound operation of the Bank.

7. **DEFENDANTS** were each voting members of the Bank's Internal Loan Committee (ILC). The ILC was instituted to approve loans outside of the authority of individual Bank loan officers (which was purposefully low), to ensure the quality of the Bank's loan portfolio and monitor and minimize risks in that portfolio. The ILC met approximately once per week and conducted the business of the ILC via email. These meetings were memorialized and the decisions documented in the ILC Minutes. The ILC Minutes were then part of the monthly Board of Directors Reports.

8. The FDIC is a United States government corporation, responsible for insuring bank deposits, examining and supervising banks for safety and soundness, and managing failed banks in receivership.

9. As part of its compliance with federal regulations promulgated to ensure financial institutions are financially stable, the Bank was required to file, and did file with the FDIC on a quarterly basis, "Consolidated Reports of Condition and Income for a Bank with Domestic Offices Only – FFIEC 041," commonly known as "Call Reports," which set forth financial data about the Bank's financial position as the result of its operations for that quarter. The Call Reports were divided into a number of schedules, among them, income statements, balance sheets, and schedules of past due and non-accrual loans. Schedule RC-N of the Call Report required disclosure of the full value of outstanding loans, the payments on which were past due

for between 30 and 90 days, as well as those loans past due for more than 90 days, for the quarter period just ended.

10.     The Bank's loan accounting system generated a report of those loans that were past due, also referred to as a loan delinquency report and also referred as the "RPT-792" in the Bank's accounting system. At the end of each quarter, the loan delinquency report would provide the basis for the past-due schedules on the Call Report.

11.     The FDIC collected, stored and relied on the Bank's Call Report data for use by federal and state bank regulatory agencies, and the general public.

## PURPOSE OF THE CONSPIRACY

12.     One of the purposes of the conspiracy was to conceal the true financial condition of the Bank and to create a better financial picture of the Bank to the Board of Directors, shareholders (current and prospective), regulators and the public. To achieve this, and throughout the course of the conspiracy, **DEFENDANTS** reported false and misleading information about the performance of loans, concealed information about the status of foreclosed properties, made unauthorized transfers of Bank proceeds, and failed to disclose material facts about loans to Bank insiders to the Board of Directors, shareholders and regulators.

## MANNER AND MEANS OF THE CONSPIRACY

13.     **Payments Made on Delinquent Loans:** In furtherance of their conspiracy and scheme to defraud, **DEFENDANTS** made payments on behalf of delinquent borrowers of the Bank, sometimes using Bank proceeds obtained through materially false statements or omissions. This practice was inconsistent with the Bank's policies and procedures. This was done to conceal the true status of those loans and the overall financial condition of the Bank. On or about September 2009 and continuing through at least May 2012, **DEFENDANTS** oversaw

and directed the Bank's former Senior Vice President of Lending, Geoff Walsh, to make payments from his personal banking account to the accounts of the Bank's customers who were on the Bank's loan delinquency report. The payments made were at times without authorization or knowledge of the borrower. Walsh made the payments on the past due loans in order to prevent the delinquent loans from appearing on the Call Report. Walsh utilized other customers' funds from both internal and external bank accounts to make it appear that a borrower was bringing sufficient funds to close certain transactions, when in fact the funds had been supplied by an undisclosed third-party. On or about March 31, 2011, **YATES** made an unauthorized transfer from one borrower's restricted business checking to that customer's personal loan to cover a delinquent loan payment, which was unknown and unapproved by the customer. **DEFENDANTS'** practice of paying delinquent loans for customers with Bank or other proceeds concealed the true extent of the Bank's delinquent loans and hid delinquent loans that would have otherwise been included on the monthly Board of Directors Report and Quarterly Call Reports to the FDIC.

14. **Wire Transfer and Loan to Bank Customer M.K.:** In furtherance of their conspiracy and scheme to defraud, beginning in or about July 2010 and continuing through at least September 2010, **DEFENDANTS** and others known and unknown to the Grand Jury permitted an unsecured draw for Bank customer M.K. to be made and then approved a $1.7 million loan for the benefit of M.K. in order to conceal the unsecured draw and to pay other Bank borrowers' delinquent loans.

15. On or about July 26, 2010, a $675,000 wire transfer was requested from the Bank's cash account held at Pacific Coast Banker's Bank (PCBB) account. **YATES** approved the wire transfer despite the fact that M.K. did not have sufficient funds to cover the $675,000

draw. As such, the $675,000 was not offset by M.K.'s account and the PCBB account was out of balance and not reconciled through September 30, 2010. **YATES** received regular notification from July 26, 2010 through September 30, 2010 that the PCBB account was out of balance as a result of the $675,000 transfer.

16.     **DEFENDANTS** made material misrepresentations and omissions to the Board of Directors by failing to disclose in the Board of Directors Reports that the $675,000 wire transfer, for the benefit of M.K., was unsecured and that the Bank's books were out of balance and not reconciled for July, August and September, 2010.

17.     On September 30, 2010, a credit approval presentation (CAP), also referred to as a loan application, was presented to the ILC for a $1,700,000 loan for the benefit of M.K. **DEFENDANTS** voted to approve the CAP. Pursuant to Bank policy, **DEFENDANTS** were required to obtain approval from the Bank's Board of Directors because the amount of the loan exceeded $1,000,000. In presenting the CAP to the Board of Directors and recommending the loan for approval, the **DEFENDANTS** failed to provide material information to the Board of Directors that M.K. owed the Bank $675,000 from the unsecured wire transfer.

18.     Once the loan was funded, **DEFENDANTS** directed that a portion be used to pay the $675,000 unsecured wire transfer to reconcile the PCBB account and conceal the fact of the unsecured wire transfer. Additionally, approximately $33,327 of the loan was used to cover payments for other Bank customers on delinquent loans in Q3–2010. Without the improper use of the loan for the benefit of MK to pay other customers' delinquencies, the Bank would have had to report approximately $1,392,390 in additional delinquent loans to the Board of Directors and on the Quarterly Call Report.

19.     **Straw Buyer Purchase (A Avenue Property):** On or about October 2010,

through at least May 2011, **DEFENDANTS** and others known and unknown to the Grand Jury, recruited D.W., an employee at the Bank, to facilitate a straw buyer purchase of real property located at 952 A Avenue, Lake Oswego, Oregon 97034 ("the A Avenue Property") in order to conceal a loss to the Bank. L.B. was the previous owner of the A Avenue Property and had obtained a first mortgage with Citimortgage and a second mortgage of approximately $325,000 with the Bank. On or about October 2010, Citimortgage foreclosed on the A Avenue Property and reconveyed it to Federal National Mortgage Association (Fannie Mae), who then listed it for sale. After Citimortgage foreclosed, pursuant to Bank policy and procedure, L.B.'s loan should have been charged off by the Bank. Instead, **DEFENDANTS** inappropriately recorded the A Avenue Property as "other real estate owned" (OREO) in the Bank's records so that the Bank did not incur the remaining approximate $99,000 loss and **DEFENDANTS** could manipulate the OREO account. This was inconsistent with the Bank's policies and federal and state regulations because the Bank did not have any equity interest in the A Avenue Property after the foreclosure.

20. In January 2011, **DEFENDANTS** agreed to and did provide Bank employee, D.W., two checks in the amount of $26,500 and $241,227.89 from the Bank's own cash account to purchase the A Avenue Property from Fannie Mae. **YATES** falsely represented in the transactional documents that D.W. personally funded $267,727.89 for the purchase of the A Avenue Property. The A Avenue Property was thereafter titled in the name of D.W.

21. In May 2011, **DEFENDANTS** identified G.R. as a third-party buyer to purchase the A Avenue Property and agreed to give a mortgage to G.R. to make the purchase. On or about May 5, 2011, the day before the sale of the A Avenue Property to G.R. was scheduled to close, **DEFENDANTS** directed D.W. to deed the A Avenue Property to the Bank. G.R.'s CAP for the loan to purchase the A Avenue Property was submitted to the ILC and stated that G.R. was

purchasing Bank owned property. **DEFENDANTS** voted to approve G.R.'s CAP on May 4, 2011. On or about May 6, 2011, G.R. purchased the A Avenue Property from the Bank for approximately $355,000. **DEFENDANTS** made additional materially false statements and omissions regarding the A Avenue Property transactions:

    a.    From November 2010 until May 2011, **DEFENDANTS** made materially false statements in the Board of Directors Report that the A Avenue Property was an OREO asset, when in fact it was not;

    b.    **DEFENDANTS** omitted from the February 2011 Board of Directors Report and the ILC Minutes that D.W. acted as straw purchaser and purchased the A Avenue Property;

    c.    Related documents for the loan signed by D.W. falsely stated D.W. would maintain and reside at the A Avenue Property as an owner-occupant, when **DEFENDANTS** knew D.W. never intended to occupy the residence;

    d.    Bank receipts for the amounts of $26,500 and $241,227.89 authorized by **YATES** omitted that the funds were withdrawn from the Bank and falsely showed D.W. as the remitter;

    e.    **DEFENDANTS** omitted in the May 2011 Board of Directors Report that D.W. was the previous owner and instead showed the Bank owned the property as an OREO asset.

22.    **OREO Properties Sold to Bank Customer R.C.:** In furtherance of their conspiracy and scheme to defraud, on or about March 2010, through at least June 2013, **DEFENDANTS** and others known and unknown to the Grand Jury, removed or caused to be removed two properties from the Bank's OREO account following the sales to borrower R.C.

even though the sales did not meet the requirements to remove the properties from the account. On or about March 22, 2010, R.C. purchased one OREO property owned by the Bank located in Ridgefield, Washington for approximately $427,500, and on July 30, 2010, R.C. purchased another OREO property owned by the Bank located in Portland, Oregon for approximately $385,000. The **DEFENDANTS** did not require R.C. to make any down payment at the time of either of the purchases and provided R.C. 100% financing from the Bank for both properties. As a result of the transactions, the **DEFENDANTS** removed or caused to be removed both properties from OREO classification and they were no longer reported on the FDIC Quarterly Call Reports as OREO assets.

23. On or about January 24, 2011, FDIC examiners questioned the validity of the accounting of R.C. purchases and the removal of the properties from the Bank's OREO account. Examiners advised **DEFENDANTS** that because the Bank had sold both properties without requiring a down payment, the purchases did not meet the minimum equity requirements needed to remove the properties from the OREO account. Examiners instructed **DEFENDANTS** to review the purchase and financing of the R.C. transactions and ensure they complied with proper accounting standards and qualified for removal from OREO classification. **YATES** subsequently advised the examiners that R.C. was going to make down payment for the two properties, which would then allow the Bank to properly remove the properties from OREO.

24. On or about February 28, 2011, a senior manager from Moss Adams LLP, the Bank's independent auditor, contacted **YATES** via e-mail regarding the down payment for the R.C. On or about March 17, 2011, **DEFENDANTS** executed a management representation letter, also known as a "management rep" to Moss Adams LLP. The letter signed by **DEFENDANTS,** stated that the Bank received all of the down payments for the properties

purchased by R.C., when in truth and fact, no payments had been received from the Bank.

25.     In approximately August 2011, **DEFENDANTS** misappropriated or caused to be misappropriated approximately $37,500 from R.C.'s demand deposit account (DDA) without R.C.'s knowledge or permission. On or about December 29, 2011, **DEFENDANTS** presented a CAP to the Bank's ILC for $100,000 on behalf of R.C., which sought a loan for improvements to R.C.'s investment properties that he purchased from the Bank. R.C. was not aware of the CAP for $100,000 nor had he authorized **DEFENDANTS** to submit one on his behalf. **DEFENDANTS** approved the loan. Once the loan funded, **DEFENDANTS** directed that approximately $92,500 be applied, in combination with the $37,500 improperly removed from R.C.'s DDA, as a down payment for the two properties, in order to keep the properties off of the Bank's OREO list. **DEFENDANTS** made additional materially false statements regarding the purchase of OREO properties by R.C. and his loans from the Bank:

      a.    **DEFENDANTS** falsely stated in the monthly Board of Directors Report, signed and prepared by the **DEFENDANTS**, from March 2010 until December 2011 that both of the OREO properties purchased by R.C. were properly removed from the Bank OREO account, when in fact they were improperly removed;

      b.    **DEFENDANTS** falsely reported the removal of OREO of approximately $760,000 from 2010 through 2013, until the FDIC uncovered accounting problems with the R.C. loans;

      c.    On or about January 31, 2011, **YATES** prepared two memos to each of the R.C. loan files that falsely stated R.C. was willing to make a 15% down payment toward both properties;

**SUPERSEDING INDICTMENT**                                                                                        Page 10

        d.        In December 2011, the Bank's ILC Minutes omitted and concealed the true purpose of the $100,000 loan to R.C. and thereafter the ILC Minutes were presented to the Board of Directors as part of the monthly Board of Directors Report, prepared and signed by the **DEFENDANTS**.

26.    **Misrepresentations to Shareholders**: **DEFENDANTS** regularly issued Investor Updates to shareholders regarding, among other things, the Bank's Texas Ratio. The Texas Ratio is considered a warning indicator of potential trouble at a bank and is determined by dividing the bank's nonperforming assets (nonperforming loans and the real estate owned by the bank) by its tangible common equity and loan loss reserves. The Texas Ratio takes into account two important factors in a bank's health: the number of bad loans it has made and the cushion the bank's owners have available to cover those bad loans. If too many of the bank's loans are nonperforming, the bad loans will erode the bank's equity cushion, which could cause the bank to fail. Likewise, if there is not enough equity in a bank, the bank will not be able to absorb very many bad loans and the bank may fail. The Texas Ratio is sometimes expressed as a percentage—as the percentage increases, the bank's risk of failure rises. And relatively speaking, the higher the percentage, the more precarious the bank's financial situation. The defendants purported that the overall average for banks in the State of Oregon in 2009 was approximately 61.4% and in 2010 it was 53.7%. During the relevant time period, **DEFENDANTS** caused the Bank to misrepresent the Texas Ratio to investors as follows: Q4 – 2009: 21.19%; Q2 – 2010: 4.36%; Q3 – 2010: 3.76%; Q4 – 2010: 6.8%; Q3 – 2011: 4.0%; Q4 – 2011: 4.0%. These statements misrepresented the true extent of delinquent loans for the relevant time period.

        All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2 THROUGH 19
## FALSE BANK ENTRIES, REPORTS AND TRANSACTIONS
## (18 U.S.C. §§ 1005, 2)

1. The Grand Jury realleges each and every allegation contained in each of the paragraphs 1 through 26 of Count 1 of this Indictment, and incorporates them by reference as if set forth herein.

2. On or about the dates listed below, in the District of Oregon and elsewhere, **DEFENDANTS DAN HEINE AND DIANA YATES**, with others known and unknown to grand jury, with the intent to injure and defraud the Bank, a financial institution that was insured by the FDIC, and to deceive any officer of the Bank, the FDIC, any agent or examiner appointed to examine the affairs of the Bank and the Board of Directors, knowingly made and caused to be made false entries in the books, reports, statements of the Bank, in that **DEFENDANTS** concealed and omitted from Call Reports and Board of Directors' Reports material information about loans, the status of foreclosed properties and represented in Call Reports and Board Reports, material information about the true status of loans and assets. Each false entry constitutes a separate count of this Indictment as indicated below:

| Count | Date of False Entry | False Entry on Call Report | FDIC Call Report Quarter |
|---|---|---|---|
| 2 | Feb. 5, 2010 | Omitted delinquency of payment on M.S. loan account x45000 | Q4 – 2009 |
| 3 | April 28, 2010 | Omitted an OREO asset of approximately $427,500. | Q1 – 2010 |
| 4 | Aug. 1, 2010 | Omitted delinquency of payment on H.A. loan account x85000 | Q2 – 2010 |
| 5 | Nov. 10, 2010 | Omitted delinquency of payment on E.C. loan account x2400 | Q3 – 2010 |
| 6 | Nov. 10, 2010 | Omitted delinquency of payment on J.H. loan account x3000 | Q3 – 2010 |
| 7 | Nov. 10, 2010 | Omitted delinquency of payment on H.A. loan account x85000 | Q3 – 2010 |
| 8 | Nov. 10, 2010 | Omitted delinquency of payment on E.D. loan account x1189 | Q3 – 2010 |

| Count | Date of False Entry | False Entry on Call Report | FDIC Call Report Quarter |
|---|---|---|---|
| 9 | Nov. 10, 2010 | Omitted delinquency of payment on R.G. loan account x1270 | Q3 – 2010 |
| 10 | March 21, 2011 | Omitted delinquency of payment on E.D. loan account x1189 | Q4 – 2010 |
| 11 | April 25, 2011 | Omitted an OREO asset of approximately $360,800. | Q1 – 2011 |
| 12 | April 25, 2011 | Misrepresented the A Avenue Property as an OREO asset | Q1 – 2011 |
| 13 | April 25, 2011 | Omitted delinquency of payment on C.D. personal loan account x53000 | Q1 – 2011 |
| 14 | April 25, 2011 | Omitted delinquency of payment on J.H. loan account x3000 | Q1 – 2011 |
| 15 | Jan. 30, 2012 | Omitted delinquency of payment on C.G. loan account x6000 | Q4 – 2011 |
| 16 | Jan. 30, 2012 | Omitted an OREO asset of approximately $360,800. | Q4 – 2011 |
| 17 | Jan. 30, 2012 | Omitted an OREO asset of approximately $427,500 | Q4 – 2011 |

| Count | Date of False Entry | False Entry in Board of Directors' Reports | Date Accepted by Board of Directors |
|---|---|---|---|
| 18 | Feb. 15, 2011 | Falsely reported A Avenue as bank owned property (OREO) | March 15, 2011 |
| 19 | June 21, 2011 | Falsely reported sale of A Avenue as bank owned property (OREO) | July 19, 2011 |

All in violation of Title 18, United States Code, Sections 1005 and 2.

## FORFEITURE ALLEGATIONS
### (ALL COUNTS)

Upon conviction of one or more of the offenses alleged in this Indictment,

**DEFENDANTS** shall forfeit to the United States pursuant to 18 U.S.C. § 982(a)(2)(A) any property constituting or derived from proceeds obtained directly or indirectly as a result of the violations, including but not limited to the following:

**Money Judgment**: A sum of money equal to the amount of proceeds obtained as a result of **DEFENDANTS'** conspiracy to commit bank fraud and making false entries, reports and transactions.

If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) as incorporated by 18 U.S.C.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

§ 982(b), to seek forfeiture of any other property of **DEFENDANTS** up to the value of the forfeitable property described above.

Dated this 6th day of March, 2017.

A TRUE BILL.

\ OFFICIATING FOREPERSON

Presented by:

**BILLY J. WILLIAMS,** OSB No. 901366
United States Attorney
District of Oregon

**CLAIRE M. FAY,** DCB No. 358218
Assistant United States Attorney

**MICHELLE HOLMAN KERIN,** OSB No. 965278
Assistant United States Attorney

**QUINN P. HARRINGTON**, OSB No. 083544
Assistant United States Attorney